**Roberta OTTAVIANI, individually and on behalf of all others similarly situated, Plaintiffs,**

**Carolee Schneeman, Joan Marie de la Cova, Dorothy Jessup, Plaintiffs–Intervenors,**

v.

**STATE UNIVERSITY OF NEW YORK AT NEW PALTZ, and Clifton R. Wharton, Jr., in his capacity as Chancellor of the State University of New York, Defendants.**

**Harriet KLAPPER, Plaintiff–Intervenor,**

v.

**STATE UNIVERSITY OF NEW YORK AT NEW PALTZ, Clifton R. Wharton, Jr., Alice Chandler, Peter Vukasin, and The Trustees of the State University of New York, Defendants.**

No. 77 Civ. 6259 (SWK).

United States District Court, S.D. New York.

Jan. 11, 1988.

---

Edwards and Angell, New York City by Susan Egan, Alfred R. Poliani, for plaintiff, Roberta Ottaviani, and plaintiffs-intervenors, Carolee Schneeman, Joan Marie de la Cova and Dorothy Jessup.

Sive Paget and Reisel, P.C., New Paltz by Laura Zeisel, for plaintiff-intervenor, Harriet Klapper.

Robert Abrams, Atty. Gen. of State of N.Y., New York City by Judith T. Kramer, Jan P. Ryan, Marilyn T. Trautfield, Asst. Attys. Gen. (Lewis Rosenthal, Counsel's Office, State University of New York, of counsel), for defendants, State University of New York at New Paltz, Clifford R. Wharton, Jr., Alice Chandler, Peter Vukasin, and The Trustees of the State University of New York.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiffs in this case claim that the State University of New York at New Paltz ("New Paltz") discriminated against women in violation of 42 U.S.C. § 2000e *et seq.* (Title VII). The Court has certified a plaintiff class, which, pursuant to a stipulation, is composed of all full-time academic rank faculty members who were employed in the Division of Liberal Arts and Sciences at New Paltz at any time from academic years 1973 through 1984.[1] In the same

---

1. Faculty at New Paltz are hired into various ranks. The "academic" ranks are professor, associate professor, assistant professor, and instructor. The "qualified" ranks are all other ranks, such as lecturer. Faculty in an academic rank either hold tenure or are eligible for it (and thus on a "tenure track") and those holding qualified rank are not eligible for tenure. Ten-

stipulation, the plaintiffs limited their claims to discrimination in salary, rank, and initial placement in rank.[2]

Plaintiff Roberta Ottaviani is the class representative. Plaintiff-intervenors Dorothy Jessup, Joan Marie de la Cova, and Harriet Klapper are members of the plaintiff class because they were full-time academic rank members of New Paltz' Division of Liberal Arts and Sciences during the class period. Plaintiff-intervenor Carolee Schneeman is not a member of plaintiff class because she was a member of the Fine Arts Division. Each individual plaintiff brings separate claims against New Paltz which are discussed *infra*.

This case was tried to the Court pursuant to Fed.R.Civ.P. 52. The following are the Court's findings of fact and conclusions of law.

## I. TITLE VII: GENERAL LEGAL STANDARDS

### A. *Burden of Proof in a Class Action*

■ The plaintiff class claims that New Paltz treated women differently from men on the basis of sex. In order to prove such a claim of disparate treatment, plaintiff must prove discriminatory intent. *See Melani v. New York City Bd. of Higher Education*, 561 F.Supp. 769, 773 (S.D.N.Y. 1983). Plaintiffs must demonstrate that "unlawful discrimination has been a regular procedure or policy followed by an employer...." *Int'l Bro. of Teamsters v. United States*, 431 U.S. 324, 360, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977). The occurrence of sporadic or isolated discriminatory acts is not sufficient; gender discrimination must be New Paltz' standard operating procedure. *Id.* at 336, 97 S.Ct. at 1855; *Coser v. Moore*, 739 F.2d 746, 749 (2d Cir.1984).

■ A finding of classwide discrimination creates a rebuttable presumption in favor of individual claims of discrimination. *Franks v. Bowman Transp. Co. Inc.*, 424 U.S. 747, 772, 96 S.Ct. 1251, 1268, 47 L.Ed. 2d 444 (1976); *Teamsters*, 431 U.S. at 359, 97 S.Ct. at 1866. If the class claims are unsuccessful, individual claimants may still pursue their actions, but they must satisfy the burden of proof described in the next section.

### B. *Burden of Proof in Individual Claims*

■ The Supreme Court has established a three step process for adjudicating individual Title VII claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). First, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. *Id.* at 802, 93 S.Ct. at 1824; *Zahorik v. Cornell University*, 729 F.2d 85, 92 (2d Cir.1984). The burden of production then shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant satisfies this burden, the plaintiff must show that the reason is merely a pretext for discrimination. *Zahorik*, 729 F.2d at 92. Although the burden of production shifts to the defendant in the second step, the burden of persuasion remains with the plaintiff throughout. *Id.*

*McDonnell Douglas* sets forth four elements a plaintiff must prove to make a prima facie showing of race discrimination: 1) plaintiff belongs to a racial minority; 2) plaintiff applied and was qualified for a job for which the employer was seeking applicants; 3) despite plaintiff's qualifications he or she was rejected; and 4) the job remained open after the plaintiff was rejected and the employer continued to seek

ure is a contract to teach at New Paltz until retirement.

2. In their post-trial memorandum, plaintiffs assert a claim for discriminatory treatment in salary at hire. Since this claim is beyond the scope of the stipulation, the Court will not consider it.

Defendants argue that the Court should dismiss the claim of class-wide discrimination in rank at hire as untimely. Defendants' argument is untimely and waived. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982).

applicants with plaintiff's qualifications. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. This test is flexible and should be tailored to a specific case. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, n. 6, 101 S.Ct. 1089, 1094, n. 6, 67 L.Ed.2d 207 (1981).

■ In fulfilling its burden of showing a legitimate reason for its action, the defendant need not prove absence of discrimination. *Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir.1980). Rather, the defendant need only show that it acted on a neutral basis. *Id.* The employer's hiring practices need not be "rational, wise, or well-considered—only ... non-discriminatory." *Powell v. Syracuse University*, 580 F.2d 1150, 1157 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). The evidence the employer presents should be objective. *Sweeney v. SUNY Research Foundation*, 711 F.2d 1179, 1185 (2d Cir. 1983). Objective factors include evidence that a plaintiff's qualifications do not match those required for a job. *Id.* A defendant's subjective evaluation of objective criteria also is acceptable, but should be specific and not speculative. *Id.* at 1185–86.

■ A plaintiff can demonstrate that a neutral explanation is pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Evidence of pretext includes discriminatory statements or admissions, the mix of the workforce, an atmosphere of discrimination, the employer's general practices, comparative evidence, and statistics. *Penk v. Oregon State Board of Higher Education*, 816 F.2d 458, 462–63 (9th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987).

## C. *The Relationship Between the Class Claims and the Individual Claims*

■ Evidence of intentional discrimination against women in individual cases is relevant to the class claims of disparate treatment. It brings statistics to life, demonstrates how college policies affected the treatment of individual women, and is proof of the state of mind of college officials. *Craik v. Minnesota State University Board*, 731 F.2d 465, 471 (8th Cir.1984). Similarly, evidence of classwide discrimination is relevant to individual claims because it can demonstrate that a neutral explanation for a decision is pretextual. In short, all evidence of intentional discrimination is relevant to all claims and must be considered as a whole.

## II. STATISTICAL EVIDENCE OF CLASSWIDE DISCRIMINATION

■ Plaintiffs assert that statistical evidence alone proves their claims of classwide discrimination. Gross statistical disparities can be sufficient to prove a prima facie case of discrimination. *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977). Statistics are not irrefutable, however, and their usefulness depends on the facts and circumstances of a particular case. *Id.* Statistics used in a Title VII action against a university must account for the fact that a college hires specialists on a decentralized basis. *Coser*, 739 F.2d at 750.

Plaintiffs' statistical expert, Dr. Mary Gray, utilized a technique known as multiple regression analysis to determine whether differences in male and female salaries were based on different qualifications or other unexplained factors. *See Melani*, 561 F.Supp. at 774.

A multiple regression analysis determines the influence that various factors (independent variables) have on an observed phenomena (the dependent variable). For each independent variable, the statistician calculates a coefficient, which is the effect the variable has on a dependent variable. The coefficient is derived from the data about all the faculty members, and measures, for example, the effect a year of service (the independent variable) has on salary (the dependent variable). A multiple regression analysis can determine the effect gender has on salary either by calculating a coefficient which measures the ef-

fect of gender (either male or female), or by comparing a woman's actual salary with her predicted salary. The salary is predicted by multiplying the coefficient for each independent variable by the value each variable assumes for the faculty member, and adding the results.

Even if the results of the regression demonstrate that gender influences salary, this is not necessarily relevant. Rather, the difference between male and female salaries, measured by either the size of the gender coefficient or the difference between the actual and predicted salary, must be statistically significant. That is, the likelihood that the difference in salary is due to chance must be less than .05 percent. *Melani*, 561 F.Supp. 774. Stated another way, the odds must be less than one in twenty that the apparent difference is actually no difference for it to be statistically significant. This probability is also expressed in terms of "standard deviations". A standard deviation is a measure of the distance on a graph between the probability of an observed result and zero. The higher the number of standard deviations, the further the result is from the expected result, and the less likely it is.

This probability can be measured in two ways. The first, known as a two-tail test, measures the probability of the result falling on either side of a bell curve. The second, known as a one-tail test, measures the probability of the result falling on either the left or the right of the center. When measuring the results based on only one tail of the curve, the standard of statistical significance is 1.65 standard deviations. When using both tails, it is 1.96.

## A. *Plaintiffs' Statistical Studies*

### 1. Plaintiffs' main salary study

Plaintiffs' exhibit 882 presents the results of the regression analysis that Dr. Gray testified best represents the difference in salary between men and women at New Paltz. Dr. Gray measured salary differences for each year of the class period,

1973 to 1984. This study indicates that women earned from $1,036 to $2,277 less than their predicted salaries for the relevant years. The standard deviations associated with this ranged from $- 2.72$ to $- 6.88$. Underlying this study are a number of judgments.

### a. *Use of rank variables*

Plaintiffs' main study used the following independent variables: number of years of full-time teaching experience prior to hire at New Paltz; number of years teaching experience in academic rank at New Paltz; possession of a doctorate degree; number of years since obtaining the doctorate degree; field or discipline; number of publications; other experience prior to hire at New Paltz; and years of full-time high school teaching experience.

Dr. Gray stated that three variables—prior academic rank, current rank, and years in current rank—may influence salary. Dr. Gray, however, did not include these variables in her main study for two reasons. First, current rank and years in rank are under the control of New Paltz, the institution accused of discriminating against women, and thus might be "tainted" by discrimination. Second, rank is not a qualification, but a result of qualifications. The variables she used measure qualifications. Including rank variables would "double-count" the effect of the qualifications and decrease the extent of the difference between men's and women's salaries.

Dr. Gray submitted evidence of academic rank discrimination at New Paltz. First, Dr. Gray compared the number of men and women in the four academic ranks in academic years 1973 through 1984. (Pl.Exhs. 891 and 940) Her study indicates that women were disproportionately concentrated in the two lower ranks in each year of the study. This differential remained consistent when Dr. Gray accounted for possession of a Ph.D.[3] Dr. Judith Stoikov, de-

---

**3.** Plaintiffs did not introduce the results of a test of the statistical significance of these results during Dr. Gray's direct examination, but attempted to do so in rebuttal. The Court excluded it on two grounds: it was improper rebuttal and Dr. Gray had testified on direct that there

fendants' statistical expert, criticized this evidence as merely descriptive, not demonstrating that the results were statistically significant. Dr. Stoikov also criticized the study because factors other than a Ph.D.—such as years at New Paltz, prior experience, and publications—determine rank.

Second, Dr. Gray compared the rank at hire for men and women from 1973 to 1984. (Pl.Exhs. 889 and 952) The results indicate that New Paltz hired 34 women, 33 into the two lower ranks. New Paltz hired 80 men, 60 in the lower ranks. New Paltz thus hired a disproportionate number of women into the lower ranks. Dr. Gray divided the new hires into those with and without a Ph.D. Nobody without a Ph.D. was hired into the two higher ranks. A woman without a Ph.D. was more likely than a man without a Ph.D. to be hired into the lowest rank. Among those with a Ph.D., a woman was more likely than a man to be hired into the two lower ranks. On rebuttal, Dr. Gray presented a study of the statistical significance of these results. (Pl.Exh. 952A) The probability that gender had no effect on initial hire for all new hires and for those with a Ph.D. was less than .05 percent. Dr. Stoikov testified that there were not enough observations to complete a statistical study of the rank at hire results reported in exhibit 952, with the exception of faculty hired without a Ph.D. For those faculty, she found that the differences in rank at hire were not statistically significant.

Third, Dr. Gray compared the average years to promotion for men and women promoted from 1973–1984. (Pl.Exh. 895) She testified that the only promotion for which there was enough data to make a meaningful comparison was from assistant professor to associate professor. The average number of years to promotion for a woman was 8.55 years, and for a man, 7.00 years. Examining only those faculty members with a Ph.D., Dr. Gray found that the difference in years to promotion was 1.909 years. Dr. Stoikov criticized this study be-

cause it did not analyze differences in the rate of promotion.

Finally, Dr. Gray compared the results of a regression analysis which excluded rank variables with a regression which included them. (Pl.Exhs. 104 and 1028) The difference between the average female underpayments in each study is statistically significant. That is, the amount of the underpayment absorbed by the rank variables, determined by the underpayment in a study which did not use the rank variables, is statistically significant. Dr. Gray asserts that since rank should be based on the same factors as salary, any statistically significant difference in the residuals between the rank and non-rank studies is due to discrimination in rank. Dr. Stoikov also criticized this conclusion on the ground that Dr. Gray's study did not show that rank is discriminatory, but only that men and women were unevenly distributed among rank.

#### b. Department chair variable

Dr. Gray testified that although New Paltz adds a stipend to the salary of the chairperson of a department, she did not include a variable to reflect this in her main salary study. (Pl.Exh. 882) Her reason was that selection of department chairs was under the control of New Paltz, and tainted by discrimination. In support of this claim, Dr. Gray presented two exhibits which list the department chairs at New Paltz by gender. (Pl.Exhs. 900 and 980) The total number of chairpersons was 53.5 men and 6.5 women. The total number of years served was 194.5 to 9.5. Dr. Gray testified that the probability that gender had no effect on this difference was less than 1 out of 1000 (Pl.Exh. 1022). Dr. Gray also studied the distribution of department chair positions among faculty with more than 7 years of college teaching experience, since at New Paltz, most department chairs were tenured, and the waiting period for tenure was 7 years. The result was the same distribution of chairperson years between men and women as

was not enough data to do an analysis of the statistical significance of the results of the

study.

when she measured all faculty. The probability that gender had no effect was 5 out of 1000. Dr. Stoikov criticized Dr. Gray's failure to account for department chair stipends in her main study. Dr. Stoikov testified that Dr. Gray's proof that selection to departmental chair was discriminatory was flawed because the only factor it accounts for is whether the faculty member had seven years of experience, and selection to departmental chair depends on many other factors.

Defendants also criticized Dr. Gray for failing to use a variable for prior service in an administrative position because she did not demonstrate that women were denied administrative positions on discriminatory grounds. Defendants assert that excluding these variables from the salary regression overestimates the differential between men and women, as both factors have a positive influence on salary (Def.Exh. S6–A, Table H) and more men than women were chairpersons and administrators.

### c. *"Males only" regression*

Dr. Gray's main study is a "males only" regression. She calculated the coefficient for each independent variable using only the data for male faculty members. Then she multiplied each coefficient by the corresponding value for a female faculty member. She added together all of these figures; the sum is the female faculty member's predicted salary. That is, it is the salary she would be earning, based on all her relevant qualifications, if she were a man. Dr. Gray then subtracted the woman's actual salary from her predicted salary. This was the woman's "residual", or the measure of the difference between her actual salary and the salary she would earn if she were a man. Dr. Gray repeated this process for all the class members, added all the residuals, divided by the total number of women, and derived the average female residual. This residual is the basis for calculating the degree of statistical significance.

A males only regression is different from a total population regression. In such a regression, the characteristics of the entire population, male and female, are used to calculate the coefficients for each variable. A gender variable, either male or female, is added to the list of independent variables. The size of the gender coefficient is the measure of the effect of being male or female. For example, if the gender variable equals female, and the coefficient is − $100, the effect of being female on salary is − $100. The number of standard deviations, that is, the likelihood that gender does not influence salary, is based on the gender coefficient.

Dr. Gray preferred the males only regression because the purpose of her study was to determine if New Paltz treated men differently from women. Dr. Gray testified that the males only regression, in predicting a female's salary based on the value that the various independent variables have for a man, was superior in measuring what a woman would earn if she were paid the same as a man. The total population regression measures a woman's salary against the salary for an average person. This, Dr. Gray testified, reduces the size of the coefficients by combining the male and female values, and in turn reduces the predicted salary differential between men and women. For example, if the coefficient for a Ph.D. is $1,000 for a male and $500 for a female, and there are an equal number of males and females, the Ph.D. coefficient is $750. Dr. Stoikov, on the other hand, testified that a males only regression is not as accurate as a total population regression because it only accounts for values existent in the male population.

### d. *Excluding the nursing faculty*

Dr. Gray did not include members of the nursing faculty in her main study, even though nurses were in the liberal arts faculty and are members of the class. Dr. Gray excluded them from her study for two reasons. First, there were no male nursing faculty, and thus there were no males with whom to compare the females. Second, she determined that although the nurses were members of the faculty of liberal arts, they had different duties and received much higher average salaries than

other women on the liberal arts faculty. (Pl.Exh. 894)

New Paltz started its nursing program in 1981. There are only six nurses who are class members, and there were no more than four nurses in any year. Including the nurses in the regression thus has a minimal effect on the results. (Def.Exh. S(6), Table 20) Nevertheless, defendants argue that the nurses are members of the class, decisions about their salaries were made by the same people who made decisions about the other class members, and hence they should be included in the regressions.

### e. *One-tail measurements*

Dr. Gray expressed the statistical significance of the results in her main study according to both a one-tail and a two-tail test. The one-tail results demonstrated a higher degree of probability that gender was the cause of the observed salary differentials. Dr. Gray preferred the one-tail test because all the results were negative, that is, all the female residuals fell under the left tail of the curve.

### 2. Plaintiffs' other current salary studies

Although Dr. Gray was confident that her main salary study accurately reflected the different treatment of men and women at New Paltz, she completed other regressions which incorporated variables or employed methodologies which were not reflected in her main study.

### a. *Total population regression*

In the second half of exhibit 882, Dr. Gray did a total population regression using the same variables as in the main study. She measured the net effect of being male. In each year, men had a higher salary than predicted. The number of standard deviations and the one and two-tail probabilities were similar to those in the main study, and all were statistically significant.

### b. *Regressions including rank variables*

Dr. Gray completed five regressions which included rank variables. The first three regressions have two parts, a males only regression and a total population regression. The fourth and fifth are a males only and total population regression, respectively. The regressions include variables for current rank (Pl.Exh. 883); current rank and years in rank (Pl.Exh. 884); current rank, years in rank, and prior rank (Pl.Exh. 885); prior rank only (Pl.Exh. 989); and current rank with instructor treated as a separate rank, years in rank, and prior rank (Pl.Exh. 988).

In the first three regressions, the current rank variables included only three ranks: assistant professor, associate professor, and professor. Dr. Gray testified that she combined the ranks of instructor with assistant professor for two reasons. First, there were very few male instructors, and in some years there were none. In light of this, Dr. Gray felt it would be inaccurate to predict salaries of the female instructors based on the characteristics of a small number of males. Second, as expressed earlier, *supra*, at II. A. 1. a., Dr. Gray prepared a study which she believed demonstrated that, based on their qualifications, a disproportionate number of women were hired as instructors. By combining the ranks, she hoped to control for some of this difference. Dr. Stoikov criticized this. She testified that the result of combining rank was that a woman instructor was predicted to have the salary of a male assistant professor. This overestimates the woman's salary, and hence the differential.

Examining the males only regressions in exhibits 883 through 885, and comparing them to plaintiffs' main study (Pl.Exh. 882), yields the following observations. First, as each rank variable is added, the female residual and the degree of statistical significance consistently decrease. However, the residual remains statistically significant in a one-tail test for every year of the class period except 1984/85 in the test that includes all rank variables. The results are statistically significant under a two-tail test in all measures but three: the regression including current rank and years in rank in

1978/79 and 1984/85 (Pl.Exh. 884); and the regressions including all three variables in 1984/85 (Pl.Exh. 884).

The total population regressions which correspond to the males only regressions in exhibits 883 through 885 show a similar consistent decrease in the net effect of being male and a decrease in the number of standard deviations. The total number of differences which are not statistically significant also decreases. The measurements which are not statistically significant under either a one or two-tail test occur in exhibit 883, 1984/85; exhibit 884, 1984/85; and exhibit 885, 1979/80 and 1984/85. Under two-tails, the differences are not statistically significant in 1978/79, 1979/80, and 1980/81 in exhibits 884 and 885.

It is also worthwhile to compare the total population regression which includes all three rank variables (Pl.Exh. 885) with the regression which includes all three rank variables and treats the rank of instructor separately (Pl.Exh. 988). The net effect of being male decreases in every year except two in exhibit 988. The net effect is not statistically significant under either tail in four of the years, 1975/76, 1978/79, 1979/80, and 1984/85. It is not statistically significant under two tails only in 1983/84.

The final rank regression Dr. Gray presented was a males only regression in which she added only prior rank to the variables she used in her main study. (Pl. Exh. 989) Comparing the results of this regression with the main study indicates that prior rank does not account for much of the difference between male and female salaries. In 1982/83, prior rank increased the difference.

c. *Regressions including rank and department chair variables*

Dr. Gray prepared three males only regressions which consider the impact serving as a department chairperson has on salary. (Pl.Exhs. 888, 889, and 890) These

studies are all variations of the males only regression in exhibit 885, which includes variables for all three ranks, so comparisons with that study are appropriate.[4]

In exhibit 888, Dr. Gray simply added a variable for department chair. While the female residual remained negative, it decreased slightly in every year except 1983/84. The residual was not statistically significant in 1984/85 and 1978/79 under either tail, and under two tails alone in 1979/80. In exhibit 889, Dr. Gray did not add a department chair variable. Rather, she subtracted the department chair stipends from the salaries of department chairpersons. The average female residuals were generally slightly higher than in exhibit 888, but generally not as high as in exhibit 885. The only year in which the residuals were not statistically significant was in 1984/85. Finally, exhibit 890 combines the effects of exhibits 888 and 889 by adding a department chair variable and subtracting the department chair stipend. The results of this study were virtually identical to the results reported in exhibit 888.

d. *Regressions including nursing faculty*

Plaintiffs' exhibit 898 is a total population regression which adds a nursing variable to the variables used in plaintiffs' main study. It should thus be compared to the total population regression of plaintiffs' main study.[5] The male coefficients are positive in each year in exhibit 898, and are virtually identical to the male coefficients in the total population regression reported in the second part of exhibit 882.

In plaintiffs' exhibit 897, Dr. Gray adds a nursing variable to the results of the total population regression of exhibit 885, which includes all the rank variables. The results of the two regressions are virtually identical.

---

**4.** The studies which account for department chairs do not report results for the 1973/74 academic year, while exhibit 885 does.

**5.** Since the nursing program was established in 1981, comparisons for only the last four years of the liability period are possible.

### 3. Salary at hire

Dr. Gray also reported the results of a males only regression analysis, using the same variables as in plaintiffs' main study, for faculty hired from 1973 to 1984. (Pl. Exhs. 939) Females received a salary at hire that was an average of $535 less than men, a standard deviation of − 2.25.

### B. *Defendants' Salary Studies*

#### 1. "Validation" of the rank variable

Dr. Stoikov attempted to "validate" the use of rank variables in her salary regressions by proving that rank at New Paltz was not discriminatory. She studied the initial rank of those hired between 1973 and 1984 and promotions between 1973 and 1984.

#### a. *Initial rank*

In Table 4 of defendant's exhibit S(6), Dr. Gray determined the effect six variables had on rank at hire: possession of a Ph.D.; publications; years of prior college teaching; years of related research experience; years of other related experience; and prior rank. The results indicate that only 4.8 percent of those hired as instructors held a Ph.D. at hire, while 68.4 percent of those hired as assistant professors, and all hired as associate professors and professors, held a Ph.D. Similarly, rank at hire increased among those with one or more publications. The most influential experience variable, however, was prior college teaching: as years of prior college teaching experience increased, so did rank at hire. Finally, only one faculty member—a male —was hired at a rank lower than his prior rank.

Dr. Stoikov broke down these factors by gender. She determined that a higher percentage of males than females had a Ph.D. and at least one publication at hire. Males also had more years of experience in all three categories. Finally, the prior rank of women was proportionately lower than that of men: nearly three-quarters of the women held the rank of instructor or below, while less than half of the men did. Conversely, more than half the men held the prior rank of assistant professor or higher compared to one-fourth of the women.

In Table 6 of exhibit S(6), Dr. Stoikov presented the results of a study of the statistical significance of the influence of various factors on initial rank. Since the initial rank variable could only assume four values—instructor, assistant professor, associate professor, and professor—Dr. Stoikov employed a "maximum likelihood estimate" procedure known as logit or categorical modeling, which is designed for dealing with a dependent variable with a limited number of values.[6] Dr. Stoikov also added the following variables to the test: years of hire; academic field; and gender equals female.

The statistical analysis indicates a very high probability that a woman would be hired into the predicted rank. (Table 6, col. 5) Dr. Gray divided the results into five categories. The probability that a woman would be hired correctly[7] into: 1) one of the four ranks was 63 percent; 2) one of three ranks (combining professor and associate professor) was 87 percent; 3) the rank of instructor as opposed to the other three ranks was 44 percent; 4) an entry level rank as opposed to a non-entry level rank was 100 percent; and 5) the rank of instructor as opposed to assistant professor was from 44 to 80 percent.

Dr. Stoikov concluded from her studies that gender did not influence assignment to initial rank from 1973 to 1984. She testified that entry into the two lower ranks was a function of whether one had a Ph.D. or was about to get one, and that entry into the higher ranks was a function of years of college teaching experience and prior rank.

#### b. *Promotions*

In Table 10 of defendants' exhibit S(6), Dr. Stoikov studied the probability that a

---

**6.** Although Dr. Stoikov presented the results of a standard multiple regression analysis of the influence of the variables, she testified that this technique was inappropriate since the dependent variable—rank—could only assume four variables. The Court thus does not consider those results.

**7.** The term "hired correctly" means being hired into the predicted rank.

female would be promoted compared to a man. She studied three different promotions: instructor to assistant professor, assistant to associate professor, and associate to professor. The factors she used in her regression analyses were years since Ph.D., years in rank, department group, and gender equals female. Dr. Stoikov concluded that gender did not have an influence on promotion. The most significant influences on promotion from instructor to assistant professor were years since Ph.D. and years in rank. Years in rank was the only factor which had a significant influence on promotion from assistant to associate professor, and none of the measured factors influenced promotion from associate professor to professor.

Dr. Gray criticized Dr. Stoikov's attempt to "validate" rank on two grounds. First, Dr. Stoikov did not account for people placed in rank before 1973. Since half of the class members were hired before 1973, Dr. Stoikov's studies do not account for whether these women were hired into the correct rank. Thus, even if the waiting time for promotion was equal, they still might not be in the proper rank. Second, plaintiffs assert that the population Dr. Stoikov relied on was not a large enough population to produce reliable results in a categorical modeling or logit regression.

### 2. Salary decisions made between 1973 and 1984

#### a. *Initial salary*

Dr. Stoikov did a regression analysis of the initial salaries of all New Paltz faculty hired between 1973 and 1984. (Def.Exh. S(6), Table 11) She controlled for the same factors as in her study of initial rank, and did not include any rank variables. The results, reported at Part I of Table 11, indicate that the difference between male and female starting salary is not statistically significant.

#### b. *Rates of salary increases*

In Part II of Table 11, Dr. Stoikov measured the annual rates of salary increase.

Dr. Stoikov found that the net effect of being female was positive. Females' salaries increased faster than similarly qualified males.

#### c. *Share of discretionary increases*

Dr. Stoikov also studied whether women received their "fair share" of discretionary pay [8] from 1973 to 1984. She found that with the exception of 1977, when the percentage of women was actually higher, the percentage of female faculty receiving awards was equal to the percentage of female faculty. (Def.Exh. S(6) Table 15) Dr. Stoikov also found that the amount of the discretionary pay women received was proportionately equal. In some years women received more than their fair amount, and in others they did not. In no year was the difference statistically significant.

### 3. Current salary studies: 1973–1984

Dr. Stoikov did a multiple regression analysis of salaries paid to all full-time faculty in academic rank at New Paltz from 1973 to 1984. (Def.Exh. S(6), Tables 17 and 18) Dr. Gray included the nursing faculty in her study. The variables she controlled for were: 1) year of hire (if in 1973 or later) or years at New Paltz (if hired before 1973); 2) years of prior college teaching; 3) years of other related prior experience; 4) prior rank; 5) years since Ph.D.; 6) current rank; 7) years in current rank; 8) department group; 9) prior administrative position; 10) department chair; and 11) gender equals female. Dr. Stoikov also deducted the chair stipend from the appropriate salaries. Dr. Stoikov's regressions are total population regressions.

In Table 17, Dr. Stoikov reports the female coefficient—the effect that being female has on expected salary—in terms of dollars. In eight years the effect of being female was negative, in four years it was positive. The range in the negative years was − $15 to − $325, and the range in the positive years was $33 to $281. In none of the years was the effect of being female

---

**8.** The system for distributing discretionary pay increases is described more fully in Section III. B.

statistically significant under a two-tail test. In Table 18, Dr. Stoikov reported the effect of being female in natural logarithms, that is, the percentage of total salary. In this study, the effect of being female was negative in 11 of 12 years. The range of the effect was from − 2.6 to − 0.1 percent. The effect of being female was not statistically significant under a two-tail test.

Dr. Gray's most persuasive criticism of Dr. Stoikov's salary was her use of a year of hire variable. Dr. Gray presented evidence that the variable was extremely volatile. The effect on salary of being hired in 1973, for example, was drastically different for each year in the period, and hence unreliable. Dr. Gray also presented evidence that the year of hire variable did not measure what it purported to measure— that bad budgetary years had a negative influence on salary. She showed that being hired in 1979, a year defendants contend was a poor budgetary year, had a statistically significant effect on salary in only one year, and in that year it was positive.

#### 4. Salaries in 1971–1972

Dr. Stoikov also prepared a regression analysis of salaries paid to all full-time liberal arts faculty from 1971 to 1972. (Def.Exh. S(6), Table 23) She used the same regression technique as in Tables 17 and 18 but used different variables because she did not have as much information. She used years since Ph.D., year of hire (if hired after 1963), years at New Paltz (if hired before 1964), current rank, years in rank, department group, and gender. In 1971, the female coefficient was − $472. This was associated with − 1.7 standard deviations, which is not statistically significant under a two-tail test. In 1972, the effect of being female decreased to − $263, and the number of standard deviations decreased to − 0.99.

#### C. *Conclusions from the Statistical Evidence*

##### 1. Including rank variables in the regressions

■ Rank is an improper variable if there is evidence that rank is discrimina-

ry, and appropriate when there is evidence that it is not. *See Valentino v. United States Parcel Service*, 674 F.2d 56, 72–73, n. 30 (D.C.Cir.1982) (absent clear evidence that rank is not discriminatory, there is no assurance that rank is an appropriate variable); *Melani*, 561 F.Supp. at 782–83; *Presseisen v. Swarthmore College*, 442 F.Supp. 593, 614, 619 (E.D.Pa.1977), *aff'd*, 582 F.2d 1275 (3d Cir.1978) (inclusion of rank variable appropriate when evidence showed no discrimination with respect to promotion).

■ The plaintiffs have failed to prove that rank at New Paltz was discriminatory. Dr. Gray's studies of rank (Pl.Exhs. 891 and 940), rank at hire (Pl.Exhs. 899 and 952), and waiting time for promotion (Pl. Exh. 895), were mere compilations of data which neither accounted for factors (with the exception of possession of a Ph.D.) which Dr. Stoikov's studies persuasively showed lead to assignment to rank or promotion, nor demonstrated that observed differences were statistically significant. The exhibits which Dr. Gray introduced to show statistical significance (Pl.Exh. 891A which was not admitted into evidence and Pl.Exh. 952A which was) were unpersuasive. The only factor they measured was possession of a Ph.D. Dr. Gray's comparison of the regression which included rank variables with one that did not (Pl.Exhs. 1021 and 1028) proved only that rank had a statistically significant influence on salary, and that men and women were unequally distributed across the ranks. It did not show that the ranks were unfairly distributed or discriminatory. Finally, as is described more fully below, there is no evidence of discrimination in rank in individual cases either.

The defendants' statistical evidence, on the other hand, demonstrated that there was no discrimination in either placement into initial rank or promotion between 1973 and 1984. Plaintiffs' criticism of Dr. Stoikov's statistical study on the ground that it did not include a large enough population to be reliable is not well founded. Plain-

tiffs failed to prove to the Court that Dr. Stoikov improperly relied on the logit and categorical modeling regression techniques. *See Craik,* 731 F.2d at 476 n. 14.

The plaintiffs' second criticism of Dr. Stoikov's rank validation—that she did not account for faculty hired before 1973—is a more significant criticism but is nevertheless unpersuasive. Dr. Stoikov's studies do explain the rank at hire for at least half the class members, and explain the promotions for all class members during the relevant period.

### 2. Other variables

A regression analysis should account for holding a departmental chair in the absence of evidence that selection to departmental chairs at New Paltz was discriminatory, as it increases a faculty member's salary.

Plaintiffs failed to prove that selection to a departmental chair at New Paltz was discriminatory. There is no evidence that New Paltz deprived women of departmental chairs on discriminatory grounds. Furthermore, Dr. Gray's studies are not persuasive. Exhibits 900 and 980 merely show that more men than women held departmental chairs. They do not show that this distribution was discriminatory. Dr. Gray's attempt to prove that the distribution was discriminatory (Pl.Exh. 1022) is also unpersuasive because it does not account for any of the factors that influence selection to departmental chairs. The study in which Dr. Gray controls for faculty with at least seven years of prior college teaching is similarly unpersuasive because it accounts for only one factor.

The defendants also showed that holding a prior administrative position had a positive influence on salary at New Paltz. It is thus also appropriate to use this variable absent some showing of discrimination. Plaintiffs did prove that all prior administrators were men, but they did not show that assignment to administrative rank was discriminatory.

Finally, the Court finds that the year of hire variable is, as plaintiffs demonstrated, too volatile to be reliable. It is also not particularly helpful. As plaintiffs have shown, it does not indicate what it is supposed to—that salaries decreased in bad budgetary years.

### 3. Males only or total population regression

The males only regression predicts how women would be treated if they were treated the same as men, but does not account for factors which males do not possess. The total population regression accounts for factors not observed among males, but tends to underestimate any underpayment to women. The Court will view a males only regression from the perspective that it overestimates male/female differences to some degree, and will assume that a total population regression underestimates them.

### 4. Means of expressing probabilities: one-tail or two

Dr. Gray's position is that since all male coefficients and female residuals fell under either the positive or negative side of the tail of the bell curve, the probabilities that the results were due to chance should be expressed according to a one-tail test of probability. *See Brunet v. City of Columbus,* 642 F.Supp. 1214, 1230 (S.D.Ohio 1986), *appeal dismissed,* 826 F.2d 1062 (6th Cir.1987). Defendant's criticism of a one-tail test is also compelling: since under a one-tail test 1.64 standard deviations equal the statistically significant probability level of .05 percent, while 1.96 standard deviations are required under the two-tailed test, the one-tail test favors the plaintiffs because it requires them to show a smaller difference in treatment between men and women. *See Craik,* 731 F.2d at 475–76, n. 13. This conflict provides the Court an opportunity to review the standards for determining the legal significance of statistical disparities.

The Supreme Court has recognized that 2 or 3 standard deviations is generally sufficient to render data suspect to a social scientist. *Castaneda v. Partida,* 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977). Nevertheless, there is no threshold of statistical significance above which discriminatory intent is shown

as a matter of law, and below which it is not sufficient. *See EEOC v. American National Bank,* 652 F.2d 1176, 1192 (4th Cir.1981), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982); *Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 551 (9th Cir.1982); *Coser,* 739 F.2d at 754 n. 3 (5 percent chance of probability has no talismanic significance).

A court's approach to statistical disparities should be flexible, inferring from them what it can about the existence of discriminatory intent. When reviewing statistics which show relatively small disparities, such as one to three standard deviations, a court should be cautious about drawing an inference of discrimination. *Coates v. Johnson and Johnson,* 756 F.2d 524, 547 n. 22 (7th Cir.1985); *EEOC v. American National Bank,* 652 F.2d at 1192. When the standard deviations are small, the court's conclusions about the anecdotal evidence are particularly important to the outcome of the case. *See Segar v. Smith,* 738 F.2d 1249, 1278 (D.C.Cir. 1984), *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985).

The small difference between a one-tail and two-tail test of probability is not relevant. The Court will not treat 1.96 standard deviation as the dividing point between valid and invalid claims. Rather, the Court will examine the statistical significance of the results under both one and two tails and from that infer what it can about the existence of discrimination against women at New Paltz. *See Chang v. University of Rhode Island,* 606 F.Supp. 1161, 1205 (D.R.I.1985) (comparing one-tail and two-tail test results).

### 5. Accuracy of data

During the course of the trial, the parties disputed the admissibility of defendants' statistical reports because defendants' expert changed the data for various faculty members after she had provided it to plaintiffs' expert. The defendants assert that the plaintiffs' main studies, which do not use the changed data, are inaccurate. Only eleven pieces of data out of the thousands involved in this case are at issue. Both experts submitted studies at trial which used the data of the other expert. (Pl. Exhs. 985, 986, and 987; Def.Exhs. S(6)(B), Tables 26 and 27) The results indicated that the data differences do not make a significant difference in either study. The slight differences in each database do not affect the weight the Court accords to either experts' studies.

### 6. Conclusions from plaintiffs' statistics

The Court makes the following conclusions about plaintiffs' statistical studies. First, plaintiffs' regression analyses which do not control for the variables of rank, current rank, and prior rank are not of sufficient weight to demonstrate discrimination. This includes plaintiffs' main study, exhibit 882. Plaintiffs' studies which do not include all three rank variables are not sufficient either. (Pl.Exhs. 883, 884, and 989) This also includes plaintiffs' study of salary at hire, which does not control for prior rank. (Pl.Exh. 939) Second, plaintiffs' rank regressions which also control for service as department chair (Pl.Exhs. 888, 889 and 890) are more persuasive than the rank regression that does not control for department chair. (Pl.Exh. 888) Third, even those studies that do control for department chair are slightly less persuasive because they do not control for prior administrative rank. Fourth, plaintiffs' males only regressions are acceptable, even though they exclude the nursing faculty and instructors, with the caveat that they slightly overestimate the difference in treatment.

This leaves plaintiffs' exhibits 888, 889 and 890 as their most persuasive studies. These control for education, experience, current rank, years in rank, prior rank, and department chair. In all three studies, the average female residuals are negative. The following table summarizes the range in which the standard deviations in each exhibit fall.

Total number of standard deviation measures which fall between:

| | 0–1 | 1–2 | 2–3 | 3–4 | 4–5 | 5–6 | 6+ |
|---|---|---|---|---|---|---|---|
| Ex. 888 | 1 | 2 | 3 | 2 | 3 | 0 | 0 |
| Ex. 889 | 0 | 2 | 3 | 2 | 3 | 1 | 0 |
| Ex. 890 | 1 | 3 | 2 | 3 | 2 | 0 | 0 |

The residuals are thus generally associated with standard deviations between one and five. Two residuals fall below one standard deviation, one residual is greater than five standard deviations, and none are higher than six. These deviations alone, particularly in light of the caveats described above, are not sufficiently high to support a prima facie claim of salary discrimination. On the other hand, the statistics do not preclude an ultimate finding that plaintiffs have made a prima facie showing. The Court will thus consider these statistics in conjunction with other anecdotal evidence of discrimination.

### 7. Conclusions from defendants' statistics

The Court makes the following conclusions about defendants' main study of current salary, at Tables 17 and 18 of exhibit (S)(6). First, the volatility and questionable reliability of the year of hire variables renders the results somewhat questionable. Second, as a total population regression, it tends to underestimate the male/female disparities. Defendants' current salary studies demonstrate a much lesser degree of discrimination against women than do the plaintiffs'. In light of the Court's finding that the defendants' total population regressions underestimate the degree of salary differential between men and women at New Paltz, however, the residuals are not low enough that they alone rebut a finding of class-wide discrimination. They do, however, require the Court to scrutinize plaintiffs' statistical studies and other evidence very carefully.

Defendants' studies of salary decisions made between 1973 and 1984 (Exhibit S(6), Tables 11 and 15), are of limited usefulness in assessing salary discrimination because they do not account for the residual of any pre–1973 discrimination. *See Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 3006–07, 92 L.Ed.2d 315 (1986).[9] These studies are relevant, however, in assessing the state of mind of the New Paltz Administration from 1973–1984, which is the class

liability period. They demonstrate that the Administration did not discriminate against women in initial salary, rate of increase, or distribution of discretionary money.

## III. EVIDENCE OF COLLEGE–WIDE DISCRIMINATION AGAINST WOMEN

### A. *Affirmative Action Program*

 The existence of an affirmative action program "is the antithesis of a pattern and practice of discrimination based on sex." *Coser*, 739 F.2d at 751. Evidence of good faith adherence to an affirmative action program is relevant to the issue of discriminatory intent. *Craik*, 731 F.2d at 472. The absence of a plan does not prove class-wide discrimination, but indicates that heightened scrutiny of university employment practices is appropriate. *Chang*, 606 F.Supp. at 1183–84. Plaintiffs attempted to prove that New Paltz did not have a viable affirmative action program.

### 1. The New Paltz Affirmative Action Plan

Lorraine Bagley's first responsibility as New Paltz' first affirmative action officer in 1974 was to develop an affirmative action plan. Bagley completed the plan in 1975. (Pl.Exh. 151) The plan required the affirmative action officer to review all faculty employment decisions, including hiring, contract renewal, tenure, promotion, and salary. The plan also implemented a new search procedure for all faculty searches. It required search committees to place advertisements in journals with wide circulation among minority and female teachers and students, and to submit all pertinent information about the search to the affirmative action officer. The affirmative action officer had to approve the procedures before a new faculty member could be hired. The plan also stated that New Paltz had completed a study of salary inequity among the faculty which determined that some salaries were inequitably low,

---

**9.** Dr. Stoikov's study of pre–1973 discrimination was limited only to 1971 and 1972 and is of limited usefulness.

and that this was not due to discrimination, but to the poor condition of the budget in the year the faculty member had been hired.

The 1975 plan did not include goals and timetables for the hiring of female faculty. Nor did it include an underutilization analysis, which compares the percentage of women on the faculty with the percentage of women holding a doctorate nationally, and is the basis for developing goals and timetables. Bagley testified that she did not prepare an underutilization analysis because the only data available was a tabulation of the percentage of women with doctorates. She needed data which divided the women by discipline, such as history, math, and chemistry, and even further into sub-disciplines such as Asian history and Medieval history.

In 1979, the University of Colorado published data which satisfied Bagley. She did an underutilization analysis, and found that with one exception, none of the departments at New Paltz underutilized women. She thus did not prepare goals or timetables because she did not believe they were necessary. Bagley did not save this analysis.

Bagley's handling of the affirmative action plan contravened SUNY policies in two ways. First, SUNY required all its campuses to set goals and timetables. Second, SUNY required each campus to update its plan annually, and Bagley never updated the 1975 plan. (Pl.Exh. 16) She testified that she was too busy monitoring employment decisions to do so.

In 1980, New Paltz appointed Margaret Wade as affirmative action officer, and she updated the plan in 1981. (Pl.Exh. 6) This updated plan contained an underutilization analysis, goals and timetable. New Paltz underutilized women in 6 out of 30 departments, and set hiring goals accordingly. (Exh. 16, p. 53) The record does not indicate whether New Paltz achieved these goals. Nor does it disclose New Paltz' efforts, other than regular affirmative action procedures, to achieve these goals.

### 2. Part-time affirmative action officer

Bagley had been a full-time affirmative action officer, but New Paltz appointed Wade on a part-time basis. Prior to her appointment, Wade was an assistant professor in New Paltz' political science department. After her appointment, she remained in the department on a half-time basis. This arrangement benefited both Wade and New Paltz: it allowed Wade to continue teaching but stopped her tenure clock while she earned a Ph.D. New Paltz eliminated Bagley's $17,000 per year salary and replaced it with an annual stipend of $1,000 it paid to Wade. Wade worked as affirmative action officer approximately 25 hours per week. She spent less time monitoring searches than did Bagley, but her other responsibilities were the same.

### 3. Monitoring employment decisions

The record indicates that the affirmative action office was closely involved in faculty employment decisions. Whenever an opening arose, the department notified the affirmative action officer. She informed the department chair of the requirements for the search, and insured that the search was done according to the affirmative action guidelines. In 1983, this system was revised slightly. (Def.Exh. H(7)(b)) The affirmative action officer placed adverisements and received resumes herself.

The affirmative action officer also monitored promotions, tenure decisions, contract renewals, and discretionary salary increases. Bagley testified that the Administration gave her lists of all faculty it considered each year. She reviewed decisions which she felt might have been unfair by comparing the personnel files of unsuccessful applicants with successful applicants. She then made any objections to the academic vice-president. If he did not concur, they took the dispute to the president, who made the ultimate decision.

### 4. Conclusions

New Paltz' affirmative action program was relatively weak. It did not include hiring goals and timetables until 1981. Although some of this delay might be excused by the absence of refined data, Bagley could have done a less sophisticated

study and developed rough goals and time-tables. New Paltz also reduced the affirmative action officer's job to part-time in 1980 without a corresponding reduction in workload. On the other hand, the program had some strengths. The affirmative action officer discussed all employment decisions with the academic vice-president or president and had to approve all initial hires. In summary, New Paltz' uneven commitment to affirmative action requires the Court to scrutinize employment practices at New Paltz with great care.

B. *Salary Equalization*

1. Salaries at New Paltz: General

Each faculty member at New Paltz received an across-the-board salary increase each year. The union representing all the faculty in the State University of New York ("SUNY") system negotiated this increase with SUNY. New Paltz was not involved in these negotiations. Each faculty member was also eligible for a discretionary salary increase on an individual basis. SUNY and the union also negotiated the amount of discretionary money available to each campus.

New Paltz used a rather complex system for distributing discretionary pay increases. Many different parties made recommendations, including the academic vice-president and the Central Committee on Promotion and Salary. The final distribution of the money, however, was at the discretion of the president. New Paltz divided its discretionary salary increases into three broad categories: inequity, merit,

and promotional. In the earlier years of the liability period, New Paltz also used discretionary money to pay chairpersons' stipends.

2. Methods for distributing inequity increases

New Paltz granted an inequity increase to a faculty member whose salary it determined as inequitable. New Paltz defined an inequitable salary as one which was lower than a comparable faculty member. The cause of the inequity could be anything, including discrimination. During trial, and in the relevant documents, New Paltz asserted that inequitable salaries were due to year of hire: a faculty member hired in a bad fiscal year would generally receive a lower salary than one hired in a good fiscal year. There was no basis in the record for this explanation, and as described earlier, the statistics do not bear this out either. During the years in question, New Paltz employed various means for distributing inequity increases.

a. *Academic years 1973–1975: mandatory minimum salaries*

In these three years, New Paltz set minimum salaries for faculty of the same rank who had approximately the same number of years in that rank. Those faculty furthest below these salaries were eligible for inequity increases. (Pl.Exhs. 130, 174, and 280)

The amount and percentage of awards in the four different categories in the years 1973 to 1975 are as follows: (Pl.Exh. 280)

| Year | Promotion | Merit | Inequity | Dept. Chair |
|------|-----------|-------|----------|-------------|
| 1973/74 | $ 6,400/8% | $11,975/15% | $61,190/77% | – – |
| 1974/75 | $ 9,100/18% | $27,200/54% | $ 8,864/18% | $5,285/10% |
| 1975/76 | $10,500/15% | $43,300/61% | $17,400/24% | – – |
| Totals | $26,000/12.9% | $82,475/40.9% | $87,454/43.4% | $5,285/2.6% |

In two of the three years New Paltz awarded more money for merit than inequity, but overall, New Paltz awarded more inequity than merit money.

As plaintiff's expert testified, the minimum salary system has a major weakness as a remedy for salary inequities. Even if

New Paltz increased a woman's salary to the minimum, her salary might still be below a comparably qualified male's salary.

b. *1976: The Kent State Salary Study*

Bagley and the New Paltz Administration were unsatisfied with the minimum

salary system because it did not account for factors such as date of hire, rank at hire, promotion, and publications. (Pl.Exh. 130) Bagley recommended that New Paltz use a newly developed method, described in the Kent State Salary Study. (Pl.Exh. 780) The Kent State method was a multiple regression analysis which controlled for rank, years of service, and median years for all faculty at a given rank. (Pl.Exh. 154) Bagley used the Kent State Study to calculate the predicted salary for each faculty member at New Paltz. However, SUNY then informed New Paltz that due to budgetary constraints, no discretionary money would be available that year. New Paltz never actually applied the Kent State Salary Study.

### c. *1977–1979: The AAUP Kit*

From 1977 to 1979, New Paltz employed a new system: the Higher Education Salary Evaluation Kit published by the American Association of University Professors. (the "AAUP Kit") (Pl.Exh. 155) To calculate predicted salaries for women, the AAUP Kit recommended a males only regression which controlled for year of birth, highest degree, years since highest degree, and department. It recommended against using a rank variable. The AAUP Kit recommended that a college investigate the circumstances of all women whose salary fell below the predicted level.

Bagley's application of the AAUP Kit at New Paltz deviated from the AAUP recommendations in two ways. First, she included a rank variable in the study. Second, she investigated only those women whose salaries were at least .5 standard deviations below the norm in 1977 and one standard deviation below in 1979. (Pl.Exhs. 158 and 777)

### d. *1980, 1981, and 1982 academic years: no method*

In the 1980 school year, New Paltz decided that it would no longer employ a formal method for determining salary inequity. New Paltz determined that the AAUP Kit was no longer useful because the same women whose salaries were below the pre-dicted level in previous years and whom New Paltz had determined were not receiving an inequitable salary were identified by the study again that year. This reasoning is subject to criticism. The values for the variables in the AAUP Kit change each year, and thus can produce different results each year.

After New Paltz abandoned the AAUP Kit, its system for distributing equity increases was one of "self-identification". A person who felt she was receiving an inequitable salary presented her case to the New Paltz Administration which investigated and made a decision. The number of equity awards in each year under this system declined drastically. (Pl.Exhs. 914, 915, and 916)

### 3. Salary study by the Committee on the Status of Women

In 1973, Joel Swift, an assistant to the New Paltz president and the New Paltz liaison for affirmative action, asked the Committee on the Status of Women, a New Paltz women's advocacy group, to investigate possible inequities in the salaries of men and women. (Pl.Exh. 125) The Committee contacted all women faculty at New Paltz and asked them to send the Committee information about their rank, academic degrees, years of service and teaching experience, publications, and college service. (Pl.Exh. 395)

Approximately 32 women responded. The Committee then "paired" each woman with a similarly situated male faculty member and compared their salaries. The Committee concluded that each of the women was underpaid by an average of $1,000 a year. (Pl.Exh. 126)

The Committee submitted its report on February 7, 1974. In March, New Paltz President Stanley Coffman announced in the New Paltz "Newsletter" that among his priorities for the distribution of discretionary money that year would be to rectify salary inequities, particularly those identified by the Committee on the Status of Women. (Pl.Exh. 406) The Committee also sent a memorandum to the Central Committee on Promotion and Salary Increase asking that it give priority in its

recommendations about the distribution of discretionary money to salary inequities as well. (Pl.Exh. 127) Coffman invited the Committee on the Status of Women to participate in the deliberations about the discretionary money. (Pl.Exh. 128)

The Committee was not satisfied with the ultimate distribution of the discretionary money, feeling that New Paltz had ignored its findings. (Def.Exh. D(6); Pl. Exh.–120) The Committee also felt that New Paltz did not dedicate enough money to salary inequities. The Committee was correct in its opinion that New Paltz had not relied on the Report. Vukasin and Coffman asked Bagley to investigate the comparisons in the report. She found the faculty pairings were inappropriate as people in different departments with different degrees had been compared. Thus, New Paltz did not rely on the comparisons in the report.

### 4. Conclusions

 It is clear to the Court that New Paltz' methods for identifying cases of salary inequity from 1973 to 1984 were flawed, improperly applied, or non-existent. On the other hand, it is also clear that New Paltz distributed large portions of its discretionary pay to redress salary inequity, including a majority of the money from 1973 to 1975. While New Paltz did not dedicate all the discretionary money to inequity increases, Dr. Stoikov's salary studies reveal that women received their fair share of all discretionary salary increases, inequity or not. *See supra*, Section II. B. 2. c. New Paltz' failure to use the results of the report by the Committee on the Status of Women is legitimate because the report was flawed. Finally, although New Paltz' decision to abandon a methodology for identifying inequity cases was not based on valid reasoning, New Paltz continued to distribute equity increases. In sum, New Paltz' distribution of discretionary money was a flawed but good faith attempt to remedy pay inequities. It is thus evidence that New Paltz did not intend to discriminate against women.

### C. *Retrenchment and Non-renewals*
#### 1. Background: Faculty appointments and budgets

Full-time faculty at New Paltz either had tenure or a term contract. Tenure was a lifetime employment contract. Term contracts were for three years or less. Faculty were eligible for tenure after seven years of full-time college teaching.

New Paltz does not determine its annual budget. The governor, state legislature, and SUNY bureaucracy do. In many of the years in the liability period, they reduced or froze New Paltz' budget, and required New Paltz to reduce the number of faculty budget lines at New Paltz.

The New Paltz president, in consultation with the academic vice-president, dean and various committees, decided how, among three alternatives, to reduce faculty: attrition through retirement or resignation; retrenchment, which is the termination of a tenured faculty member; and budgetary non-renewal, which is failure on budgetary grounds to renew a term contract after it expired. Of these three methods, retrenchment is the most drastic. It means breaching lifetime contracts with faculty members who had dedicated many years of service to New Paltz in reliance on long-term employment. It also results in blacklisting by the AAUP, grievances, and lawsuits. The faculty's contract did not mandate budgetary non-renewal over retrenchment.

The president's discretion in retrenching faculty was limited to a small degree. The union contract required New Paltz to retrench faculty from a department according to seniority. New Paltz could easily manipulate this rule, however, as it was allowed to define the department it was retrenching as it wished. New Paltz could designate a department such as history to be retrenched, or a specialty within that department, such as American history.

New Paltz also followed a number of self-imposed guidelines to implement faculty reductions. First, it attempted to retain its character as a liberal arts college. It attempted to maintain the "respectability" of such "core" liberal arts departments as philosophy and history. Second, New Paltz

did not want to cut programs which attracted students to New Paltz, such as nursing, engineering, and geology. Third, New Paltz attempted to reduce faculty in a manner that would preserve its affirmative action goals. Fourth, New Paltz considered whether the student/faculty ratio in a department was low. Finally, New Paltz accounted for the extent to which a department "fed" other departments with students. For example, the student/faculty ratio in secondary education was low, and although the department was retrenched, it was not as severely retrenched as it might have been because all secondary education students took several courses in other liberal arts departments.

### 2. Overall reductions and effect on women

From 1973 to 1982, New Paltz reduced the total number of faculty budget lines from 385.48 to 309.28. (Def.Exh. V(6)(11)) It thus lost approximately 76 faculty budget lines during the bulk of the liability period. Nevertheless, the percentage of female faculty members in the liberal arts faculty actually increased from 14.9 percent in 1973 to 17.9 percent in 1984. (Def. Exh. S(6), Table 15) From 1975 to 1979, the percentage of women in the entire faculty increased from 21 to 23 percent. (Def. Exh. B(2)(h)(i)) From 1973 to 1979, New Paltz renewed an equal percentage of male and female faculty contracts.

The parties scrutinized three particular years at trial. In 1976, New Paltz retrenched 9 tenured faculty members, 7 men and 2 women. (Def.Exh. V(6)(20)(a)) New Paltz rehired one male, so that it retrenched a total of six men and two women. In 1979, New Paltz retrenched 21 tenured faculty and rehired 3, for a total of 18 retrenchments. (Def.Exhs. V(6)(20) and V(6)(20)(a)) Sixteen men and two women were the victims. Although in terms of raw numbers men were thus more severely cut than women in these two years (22 to 4), a much higher percentage of men than women had tenure (85 to 15 percent in 1975). The retrenchments in these years were thus proportionately equal.

In 1978, SUNY informed New Paltz that it would lose at least 10 faculty members in 1979. Peter Vukasin, who was the acting president, decided to "non-renew" faculty on budgetary grounds in 1978 so as to avoid retrenchment in 1979. Vukasin considered all the faculty whose contracts were up for renewal in 1978, and non-renewed 6 women and no men. (Pl.Exh. 837) He rehired one of these women, Whightman Mayo. Vukasin consulted the SUNY affirmative action office, the New Paltz affirmative action office, and various women's groups on campus about these decisions. At trial, Vukasin testified about each faculty member up for renewal in 1978, and explained his reasons for renewing or non-renewing them. His reasons were consistent, reasonable, and in accord with the guidelines described above.

### 3. Conclusions

■ The New Paltz Administration disliked eliminating faculty lines. During his testimony, Vukasin's demeanor conveyed how agonizing decisions about faculty cuts were. The evidence indicates that New Paltz reduced faculty according to legitimate factors. Although the factors were subjective and vague, New Paltz applied them consistently and after due deliberation. In some years the cuts bore more heavily on women than men, but overall women fared as well as, if not better than, men.

## D. *The Women's Studies Program*

■ Disdain for women's issues and for those who concentrate on them is evidence of intent to discriminate against women. *Spaulding v. University of Washington,* 740 F.2d 686, 702 (9th Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 1511, 83 L.Ed.2d 401 (1984). Plaintiffs contend that defendants' treatment of the Women's Studies Program at New Paltz demonstrates a disdain for women's issues and raises an inference of discrimination.

### 1. Background

The Women's Studies Program ("the Program" or "Women's Studies") at New Paltz is an interdisciplinary program, not a

department. Women's Studies has one full-time faculty member, and faculty from other departments offer courses which are cross-listed under Women's Studies. Faculty in the liberal arts, education, physical education, and fine and performing arts divisions offered courses in the Program. The Program has a coordinator, not a chairperson. The Women's Studies Steering Committee (the "Steering Committee") is the Program's governing body.

The Program has been a center of controversy at New Paltz since at least 1982, when Marleigh Grayer Ryan, dean of the Division of Liberal Arts and Sciences, refused to reappoint Nancy Schniedewind as coordinator of the Women's Studies Program. The controversy is both personal and political. Ryan clearly expressed her dislike for Schniedewind at trial. They also seem to disagree about the proper role of Women's Studies. Ryan envisions a traditional academic department which emphasizes scholarly pursuit and integration with and acceptance by the rest of New Paltz. (Def.Exh. M(7)(i)) Schniedewind, on the other hand, promoted a much more activist and political Women's Studies Program which was dedicated to fighting an oppressive society, of which she considers the New Paltz Administration a part. (Def. Exh. M(7)(i))

### 2. Removal of Schniedewind as Coordinator

Schniedewind served as coordinator of the Women's Studies Program from 1978 to 1983. In 1983, her term was complete, and the Steering Committee unanimously approved her reappointment. Ryan did not reappoint her. Her public explanation was that she wanted a coordinator from liberal arts and Schniedewind was from the school of education. This explanation seemed specious to Schniedewind at the time: the Program spanned all of New Paltz' divisions, including liberal arts and education. Ryan disclosed at trial that her announced explanation for Schiedewind's removal was, in fact, pretextual. The'real reason Ryan removed Schniedewind was that she did not believe Schniedewind had been truthful

with her. Ryan was not able to state a specific example of untruthfulness.

### 3. Search for a new coordinator

Plaintiffs complain about two aspects of the search to replace Schniedewind: the conduct of the search and the person selected as the new coordinator.

Dean Ryan appointed a separate committee to conduct the search, rather than allowing the Steering Committee to do it. The committee was composed of three persons who taught women's studies courses, and one faculty member from the history, political science, and psychology departments.

The Women's Studies representatives desired to hire a coordinator who could teach either psychology or law courses, and recommended four candidates. (Pl.Exh. 961) Dean Ryan did not hire any of the recommended faculty nor a faculty member who could teach law or psychology. Instead, Dean Ryan hired a historian, Dr. Carole Levin. Levin impressed Ryan because she received her M.A. and Ph.D. from Tufts, her specialty was British and American women's history, she had extensive teaching experience, she had taught many courses related to women's studies such as "Society and Gender in Europe, 1250–1750 and 1750–present" and "Women and Madness", and she had a long and impressive list of publications and presentations. (Def.Exh. M(7)(i))

Ryan also insisted that the new coordinator be appointed to a line in a separate department, rather than to a line in Women's Studies. (Def.Exh. M(7)(f)) Ryan testified that this increased the credibility of Women's Studies and its coordinators with other departments and chairpersons. Ryan testified that many of the faculty would not have the same amount of respect for a person appointed full-time to the Women Studies Program. Ryan also felt that a person appointed to a position in a traditional academic program brought stability to the Program because she would be less vulnerable to budget cuts. It seems, in fact, that Levin did achieve new credibility for the Women's Studies Program, both through the respect the faculty had for her

as a scholar and through her diplomatic, non-confrontational approach. (Def.Exh. M(7)(i))

### 4. Faculty commitment and reduction in lines

Despite its interdisciplinary character and use of New Paltz faculty, the Program also has faculty members specifically appointed to Women's Studies. Plaintiffs claim New Paltz previously assigned 2.5 faculty lines to the Program, but now assigns only one line. Plaintiffs argue that it is important that the Program have its own faculty as it enables the Program to develop a core faculty and an adjunct faculty whose expertise is different from the existent New Paltz faculty. Plaintiffs also argue that the reduction in lines is evidence of New Paltz' lack of commitment to the Program. Much of the testimony at trial about this issue involved the 1982 departure of Kristin Miccio, whom plaintiffs claim had been a half-time adjunct in the Program. (Pl.Exh. 962) Plaintiffs claim that after Miccio resigned, New Paltz assigned that half-line to another department.

Ryan's view of New Paltz' commitment to the Program and the assignment of faculty lines is different. First, she claims that Miccio's half-line had never been assigned to the Program, and that New Paltz replaced Miccio with an adjunct who teaches the same courses Miccio did. Second, rather than assigning separate faculty lines to the Program, Ryan prefers to recruit existent New Paltz faculty committed to teach Women's Studies courses for three years. Pursuant to this, she has developed a "Women's Studies Faculty", composed of faculty willing to make a three-year commitment to teaching courses in the Women's Studies Program. (Def.Exhs. M(7)(g), M(7)(k), and M(7)(1)) Those not able to make a three-year commitment can teach Women's Studies courses, but are not considered "Women's Studies Faculty". The Women's Studies Steering Committee as well as the Dean make recommendations for faculty. Ryan testified that her approach allows the Program and its students to plan their curriculum for a three-year

period. The Women's Studies coordinator does not have to spend her time negotiating with the various deans for the release of faculty each year, rather the Dean does. Ryan also believes that a faculty composed of "peers" from within existent New Paltz departments, rather than of faculty outside New Paltz, has more credibility with the other faculty. Finally, Ryan believes a faculty composed of insiders is less susceptible to retrenchments and budgetary non-renewals.

### 5. 1984 Evaluation of Women's Studies

In 1984, New Paltz invited two outside evaluators to review the Program. (Pl. Exh. 972) The report, while praising the Program and its faculty, criticized Dean Ryan. The report stated:

The great majority of Program people with whom we spoke believe that Dean Ryan would be glad to see the Program dismantled or transformed into something that from their point of view would be a Women's Studies Program in name only. The Dean is widely thought to see the present Women's Studies Program as lacking in academic credibility—perhaps because of its commitment to a feminist perspective as a fundamental component of educational reform.

(Pl.Exh. 972 at 18–19) The report criticized Ryan for taking the following actions: 1) removing Kristin Miccio's half-line from the Program; 2) removing another faculty half-line; 3) excluding from Women's Studies those faculty unable to make a three-year commitment; and 4) removing Schniedewind as coordinator despite the Program's unanimous recommendation to reappoint her.[10]

### 6. Conclusions

 It is clear from Dean Ryan's actions that she wants to gain more control over Women's Studies and transform it into a more traditional academic department. She removed Schniedewind as coordinator, appointed persons outside of Women's Studies to be on the search committee for a new coordinator, appointed a coordinator who was not recommended by the Women's

---

**10.** Criticisms one and three are contrary to the Court's findings.

Studies faculty, and created the "Women's Studies Faculty". It is also clear that she believes a faculty of insiders and members of traditional academic departments has more credibility than faculty who are hired as "Women's Studies" professors. Nancy Schniedewind and her supporters disagree. They seek an independent and reformist program and believe that Dean Ryan is attempting to dismantle Women's Studies and create a women's studies program in name only.

In implementing her own vision of a women's studies program, however, Ryan neither showed disdain for women's issues nor attempted to destroy the Women's Studies Program. Instead, she attempted to create what she felt was a strong and credible academic department. It is within her prerogative as dean to reject a more radical and independent women's studies program and implement her own, legitimate, though more conservative, vision. The fact that others may oppose Dean Ryan's vision of women's studies does not mean she has disdain for women's issues. In fact the impression Dean Ryan gave the Court was the opposite. She was dedicated toward building a strong program and sincerely cared about its success. Furthermore, Dean Ryan did not show disdain for persons who taught women's studies. Based on her experience and judgment, she determined that people who taught courses about women and were appointed to a traditional academic department had more credibility with other faculty than those who were appointed to a women's studies faculty line.

The Court's role here is limited. Ryan and Schniedewind disagreed over the proper direction of women's studies. The Court, however, is not in a position to decide which is correct. Rather, as long as Ryan's version does not violate Title VII, it is acceptable. The evidence shows that Ryan did not violate Title VII with regard to women's studies.

### E. *The Campus School*

■ New Paltz operated an elementary school—the "campus school"—under the direction of its school of education. The campus school teachers were officially

New Paltz faculty members, but they did not teach college courses, and worked full-time at the campus school. The mission of the campus school was threefold: to provide a training ground for New Paltz student teachers; to serve as an experimental school; and to help ease overcrowding in the public schools.

In 1975, in the midst of a SUNY budgetary crisis, the New Paltz Administration suggested closing the campus school. This suggestion caused a great protest, resulting in an agreement between SUNY and the protesters to undertake a five-year study of the school's usefulness. The study reported that while the campus school was a good school, it was not an educational laboratory and was not different from the public schools. Furthermore, the number of local school children had declined, the public schools were not overcrowded, and the schools resented the campus school taking students from them. The number of student teachers had also declined and local schools could accommodate them. In response to this trend, many other SUNY campus schools had already closed.

In 1982, New Paltz President Alice Chandler, after consultation with the affirmative action office and the various constituencies associated with the campus school, decided to close it. The eighteen female faculty members at the campus school were immediately terminated; three were eventually rehired. Nevertheless, the Court concludes that the decision to close the campus school is not evidence of Chandler's intent to discriminate against women. The serious impact on women is justified by the fact that the campus school no longer had a viable purpose and was a severe budgetary drain. The Court also notes that this is a discriminatory treatment case. Plaintiffs did not make a discriminatory impact claim. An analysis under such a claim might yield a different result.

### IV. EVIDENCE OF DISCRIMINATION AGAINST INDIVIDUALS: FACULTY MEMBERS WHO ARE NOT MEMBERS OF THE CLASS

■ Plaintiffs presented evidence of discrimination against New Paltz faculty

members who are not class members. The same committees and members of the administration who made decisions about class members, namely the separate committees on tenure/reappointment and promotion/salary, the academic vice-president, and the president, made employment decisions and recommendations about these faculty members. Evidence that they discriminated against non-class members is relevant in determining their intent to discriminate against the class or its members. Furthermore, the evidence presented about these faculty members demonstrates the effect on individual women of college-wide decisions regarding retrenchment, the method for redressing salary inequities, and affirmative action.

### A. *Nancy Schniedewind*

#### 1. Background

New Paltz hired Nancy Schniedewind in 1975 as an assistant professor in the School of Education. Her initial salary was $12,000. Schniedewind had previously taught for four years at St. Mary's State College in Maryland. New Paltz granted Schniedewind tenure in 1979 and promoted her to associate professor in 1980. She has been the coordinator of New Paltz' masters program in humanistic education since 1975, and, as described earlier, was the coordinator of the Women's Studies Program until 1983. Schniedewind received a B.A. in history from Smith College, an M.A. from Harvard University, and an Ed.D. in 1975 from the University of Massachusetts. Schniedewind has published two books (1978 and 1983) and has one forthcoming.

She has published approximately 9 articles. In 1977, she won the SUNY Chancellor's Award for Excellence in Teaching.

#### 2. Claim of salary inequity

In 1982, Schniedewind applied for a salary increase because her salary was lower than other males in her department, Educational Studies. (Pl.Exhs. 834 and 836) In support of her claim, she submitted evidence that the average male salary was higher than the average female salary at New Paltz as a whole, in the faculty of education, and in her own department. She also offered evidence that her salary was the lowest of the associate professors in her department, lower than three of the four assistant professors in her department, and only $2,031 more than a lecturer without a doctorate. Academic vice-president William Vasse asked his assistant to investigate Schniedewind's claim. She concluded that all three associate professors, and one of the assistant professors, James Yanok, were experts in special education, a field which commanded higher salaries than Schniedewind's. (Def.Exh. O(7)(7)) Vasse decided that Schniedewind's salary was not inequitable. (Def.Exh. O(7)(5) and Pl.Exh. 833)

At trial, Schniedewind testified that comparisons between herself and associate professors Spencer Salend and Joseph Trippi, both of whom taught special education, demonstrate salary discrimination. The evidence at trial regarding their experience and other qualifications in 1982 is summarized as follows:

| (YEARS) | SINCE DOCTORATE | IN RANK | AT NEW PALTZ | PRIOR COLLEGE TEACHING |
|---|---|---|---|---|
| Schniedewind | 7 | 2 | 7 | 4 |
| Salend | 4 | 1 | 1 | 3 |
| Trippi | 13 | 9 | 9 | 8 |
| Def. Exh. O(7)(6) | | | | |

Salend was a well regarded scholar with at least 15 publications at the time. He had not published any books. Trippi had published little, if anything. (Def.Exh. O(7)(12)) Lorraine Taylor, the other female associate professor, also taught special education. She was hired in 1975, the same year as Schniedewind, at a salary of $16,000, $4,000 more than Schniedewind's. In

1982, Taylor was earning less than the other male associate professors.

### 3. Conclusions

 The evidence plaintiffs presented is relevant in determining whether New Paltz responded adequately to claims of salary inequity after it abandoned its systematic method for doing so, and whether Schniedewind herself suffered salary discrimination. First, it is clear that New Paltz made a good-faith effort to investigate Schniedewind's claim of salary inequity. It analyzed the evidence she presented, and based on the valid grounds that Schniedewind's field did not command as high a salary as the professors to whom she compared herself, denied her request. Second, it does not appear that Schniedewind suffered discrimination. While she is a highly qualified and well regarded faculty member, the difference between her salary and that of Salend and Trippi can be explained. Trippi had more experience and he and Salend taught in a more lucrative field. These grounds do not appear to be pretextual, as Lorraine Taylor, who teaches special education, received a significantly higher starting salary than Schniedewind.

### B. *Susan Puretz*

#### 1. Background

 Susan Puretz is currently an associate professor in New Paltz' Physical Education Department. She taught at New Paltz intermittently from 1969 to 1973 and continuously since 1973. Puretz earned Masters' degrees in physical education/health and psychology, and an Ed.D. in 1973 in health and dance. Prior to 1973, Puretz had four years of non-college teaching experience and 6.5 years of college teaching experience.[11] Puretz has been active on numerous committees. She has also been an active union member, having been the president of the New Paltz Chapter of the Association of United University Professors. Puretz won grants in 1978 and

1981 from the SUNY research foundation. She earned the SUNY Chancellor's Award for Excellence in Teaching in 1976. Plaintiffs presented evidence at trial that Puretz suffered discrimination in hiring, reappointment, and promotion.

#### 2. Employment history: 1969 to 1976

New Paltz hired Puretz in temporary positions twice and released her twice: in 1969 and 1971. She claims she was not hired full-time until 1973 because the Physical Education Department replaced men with men, and women with women, and no full-time "women's" positions became available until then. She testified that in 1969, a male faculty member resigned and was replaced by a male. In 1971, two males resigned from permanent lines and were replaced by males. Two females in temporary lines resigned and were replaced by females. New Paltz finally hired Puretz into a tenure track line in 1973, to replace a woman who had resigned.

Puretz thus presents strong circumstantial evidence to support her claim that the Department's hiring policy was discriminatory. However, two of the male faculty who resigned were men's athletics coaches and one who resigned was the athletic director. Puretz presented no evidence that she was qualified to coach men's athletics or to be the athletic director, or that any other woman applied for those positions, was qualified, and was rejected.

In 1974, Puretz' contract was up for renewal. Her department subcommittee recommended reappointment by a vote of 5–1.[12] (Pl.Exh. 235) The Central Committee on Tenure and Reappointment recommended a two-year reappointment. (Pl. Exh. 236) Puretz' department chairperson also recommended a one-year renewal. Despite this support, Jordan Churchill, New Paltz' vice-president for academic affairs, terminated Puretz. (Pl.Exh. 230) Puretz

---

11. This includes 1.5 years at New Paltz and 5 years at Pembroke College. It is unclear from the record whether Puretz held academic rank at Pembroke, but it seems unlikely since she did not have a terminal degree when she taught there.

12. The first subcommittee had voted against Puretz, but it had been illegally convened so New Paltz appointed another one.

filed a union grievance and complaints with the State Division of Human Rights ("SDHR") and the Equal Employment Opportunity Commission ("EEOC"), asserting sex discrimination as the basis for her termination. Eventually, New Paltz offered Puretz a one-year reappointment. (Pl.Exh. 336)

No evidence in the record suggests that New Paltz discriminated against Puretz with regard to her reappointment. First, she suffered no harm, since she was reappointed. Second, she presented no evidence that similarly situated males received more favorable treatment. Third, New Paltz' explanation for the termination/reappointment—that New Paltz first intended to reduce its dance program but then received money to continue it—stands unrebutted.

### 3. Applications for promotion to professor

■ In 1977, New Paltz promoted Puretz to associate professor. In 1981, 1982, 1983, and 1984, Puretz applied for promotion to professor but New Paltz rejected her application each time. Puretz filed a complaint with the SDHR in 1983 and updated it in 1984. (Pl.Exhs. 228 and 362) She claimed that New Paltz' failure to promote her was due to sex discrimination. In support of her claim, Puretz stated that although her department subcommittee and the Central Committee on Promotion and Salary Increase recommended her for promotion in 1981 and 1982, the Administration did not promote her. In those two years, the Central Committee recommended a total of thirteen males and three females for promotion, and New Paltz promoted eight men. In 1983, Puretz did not receive the recommendation of the Central Committee. That year New Paltz promoted one female and three males. Puretz also presented evidence that from 1975 to 1983, New Paltz promoted twenty-four men and two women to professors. In her 1984 update, Puretz stated that the Central Committee recommended four men for promotion and one woman—herself—and New Paltz promoted the four men and not her. Puretz stated she believed her qualifica-

tions were equal to the men who were promoted.

New Paltz stated in response that Puretz was not promoted because she was weak in three of the five criteria mandated by the SUNY Board of Trustees for promotion: scholarly ability; continuing growth; and university service. (Pl.Exhs. 352, 360, 225, and 227.)

The resume Puretz submitted in connection with her promotion application is in evidence. (Def.Exh. R(4)) It contains a long list of publications. Nevertheless, the Court agrees with New Paltz that the publications do not demonstrate the scholarly ability which merits promotion to professor. The two books Puretz has published are not related to her field, and are minor publications. Her journal articles are relatively short and do not appear to make a significant contribution to her field. Puretz claims that her various newspaper articles about dance and which review performances are scholarly publications. The Court rejects this assertion. They do not satisfy New Paltz' legitimate criteria as serious works of scholarship. Puretz' record, however, does show strong service to New Paltz and adequate continuing growth. Puretz has served on numerous college committees, has been an active union member, and has attended several seminars, courses, and workshops.

Puretz testified at trial that she was at least as qualified as two men in other departments who were promoted: Professors Urbanski and Veghte. New Paltz' President Chandler testified that she promoted these two faculty members because of their outstanding service. Urbanski had developed an intensive language study program which brought notoriety and money to New Paltz. He also was the first chairperson of the Foreign Languages Department, which had been created out of the separate language departments that had been ravaged by retrenchments in the late 1970's. Chandler testified that Urbanski restored morale and effectiveness to the faculty and helped create a viable department. Veghte had developed and implemented an engineering program at New

Paltz. This required a great amount of time and effort—he produced a 200 page proposal. The program was very important to New Paltz and SUNY. Its development and implementation was a great accomplishment. He also instituted a lecture series at New Paltz which brought prominent scientists to the school.

Other relevant evidence regarding Puretz' claim was adduced at trial. Margaret Wade, the affirmative action officer at the time, recommended to Chandler that she promote Puretz. The basis of her recommendation was that the number of female professors had decreased due to the retirement of numerous female professors. In 1982 and 1983, Chandler denied a promotion to professor to Arnold Lendt and William Odoneal, both of whom were in the Physical Education Department. The only full professor in the Department is a woman, Gloria Bonali. Finally, on October 31, 1985, the SDHR issued a determination that it found probable cause to believe that New Paltz had discriminated against Puretz. (Pl.Exh. 254)

Plaintiffs have failed to convince the Court that New Paltz' failure to promote Puretz was discriminatory. First, Puretz' tabulation of New Paltz promotions are unconvincing as they do not compare the qualifications of the applicants and do not even indicate whether the ratio of male/female promotions was disproportionate to the number of applications. Second, the fact that Puretz was not promoted despite the recommendations of the department subcommittee and Central Committee is not evidence of discrimination in the absence of a showing that similarly qualified males who were recommended were promoted instead. Third, Puretz did not satisfy New Paltz' criteria for promotion to professor. Although her service and growth were good, her scholarship was weak. Fourth, although Urbanski and Veghte had weak scholarship records, their service was extraordinary, meriting a promotion. Fifth, given the fact that the only professor in physical education was a woman, and New Paltz recently denied two men in the Department promotions to professor, it is unlikely that New Paltz discriminated

against Puretz when it denied her application for promotion. Finally, Wade's recommendation has little weight, as it was not based on an individualized assessment of Puretz' qualifications, and the SDHR decision is only a finding of probable cause.

## C. *Sheila Schwartz*

New Paltz hired Sheila Schwartz as an associate professor in the Department of Secondary Education in 1963. She earned her Ed.D. in 1964 from New York University, and New Paltz tenured and promoted Schwartz to professor in 1970. Schwartz is one of the more accomplished faculty members in her department, having published 13 books and over 100 articles. Many of the books are novels. She has won numerous awards, including a Fulbright–Hayes Fellowship in 1977. (Pl.Exh. 518)

Schwartz testified that although her salary is now the second highest in her department, from 1963 to 1984 her annual salary was an average of $2,000–$4,000 lower than that of other men in her department. She claims that this was due to discrimination. With only one exception, Schwartz' testimony in support of the alleged discrimination was general and conclusory. She simply testified that no other men in her department had published a book, and some had published articles. The curriculum vitae and salaries of these faculty were introduced into evidence. (Pl.Exhs. 941, 942, 943, 944, 947, and 948)

The one exception is in the study by the Committee on the Status of Women, which compared Schwartz to Karl Budmen, a professor in Schwartz' department. (Pl.Exh. 126) Budmen's salary in 1974 was $19,003, Schwartz' was $16,967. Budmen had been a full professor four more years than Schwartz, and he had three more years of college teaching experience. Both had performed extensive university service. Budmen did not have any publications. (Pl. Exh. 943)

While these criteria demonstrate that Schwartz' salary should have been at least equal to Budmen's, there is other evidence

in the record explains the difference. First, New Paltz had received many complaints about Schwartz' poor relationships with administrators and student teachers from the schools in which she supervised student teaching. New Paltz took these complaints seriously, and warned Schwartz to improve. Second, New Paltz justifiably felt that Schwartz' primary commitment was to writing, not teaching. Only later in her career did she convince New Paltz otherwise. These two facts depressed Schwartz' salary, and adequately serve to explain the differences between Budmen's and Schwartz' salaries.

## V. DISCRIMINATION AGAINST INDIVIDUALS: CLASS MEMBERS

Plaintiffs also presented evidence of discrimination against individual members of the class who have not brought individual claims. This evidence is meant to illuminate the effect of New Paltz' retrenchments, affirmative action program, and inequity distributions; show the discriminatory intent of the relevant New Paltz decisionmakers; and shed light on the statistical evidence.

### A. *Susan Lehrer*

New Paltz hired Susan Lehrer in 1973 as a lecturer, which is not a tenure track position. At the time, she had a Master's degree in sociology from the New School for Social Research and was working toward her Ph.D. Lehrer had no full-time teaching experience prior to coming to New Paltz. In 1974, New Paltz promoted Lehrer to instructor, which is a tenure track position. In 1977, Lehrer failed her oral examinations and the New School released her as a Ph.D. student. Despite this, New Paltz, with great reservation and on several conditions, reappointed Lehrer in the same year. (Def.Exh. C(5)(12)) In 1980, Lehrer obtained a Ph.D. from New York University, and New Paltz granted her tenure and promoted her to assistant

professor. She did not produce any publications until 1982. (Pl.Exh. 459)

Lehrer. claims that her salary was lower than similarly situated men in her department. In 1982, for example, her salary ($19,257) was lower than Harold Jacobs' ($22,428) and Irwin Sperber's ($21,109). (Pl.Exh. 272) Lehrer identified a third man whom she claims had comparable qualifications but who received a higher salary than her: Howard Johnson. She also claims that New Paltz' procedure for remedying salary inequities did not identify her salary inequity.

The qualifications of the relevant people are as follows. Harold Jacobs started at New Paltz in 1971 as an assistant professor. He had earned all the requirements for a Ph.D. from the University of California at Berkeley, but had not completed his dissertation. He had taught for two years as a visiting assistant professor at Berkeley, had published ten articles, and eventually earned his Ph.D. in 1978. Irwin Sperber began teaching at New Paltz in 1972 as an assistant professor with all Ph. D. requirements from Berkeley except the dissertation. He had taught for four years as an assistant professor at Berkeley, published ten articles, and earned his Ph.D. in 1975. Finally, Howard Johnson had a Bachelor's degree, experience with inner city social organizations, and was an expert in jazz history.

The evidence in the record demonstrates that Lehrer's claim of salary discrimination is without merit. Sperber's and Jacobs' higher salaries were justified as they had more teaching experience, longer service at New Paltz, more extensive scholarly activity, and earlier receipt of a Ph.D. They also held a higher rank than Lehrer.[13] Lehrer had no publications and had failed the oral examinations for her Ph.D.

Any negative difference between Lehrer's and Johnson's salary is also justified. Although Johnson did not have a Master's degree, Peter Vukasin, the academic vice-president at the time, testified that John-

---

**13.** This higher rank is justified by their superior qualifications and is not based on discrimina- tion.

son's significant experience—he was in his 50's when hired at New Paltz—was an adequate substitute for a Ph.D. Further, Vukasin testified that very few people had Johnson's expertise. The Court credits Vukasin's explanation for Johnson's salary.

Finally, New Paltz made a good faith effort to decrease the differential between Lehrer's and the males' salaries. Lehrer received a promotional salary increase in 1980, an inequity increase of $1,125 in 1981, and two merit increases of $750 each in 1983 and 1984.

### B. *Barbara Scott*

■ Barbara Scott claims that New Paltz discriminated against her in salary, promotion, rank, and term of appointment. Scott also compares herself to Irwin Sperber and Harold Jacobs.

New Paltz hired Barbara Scott as a teacher's assistant in 1971. She had no prior college teaching experience and no publications at the time. In 1972, New Paltz hired Scott as a part-time instructor in sociology. She received a Master's in sociology from the New School in the same year. In 1973, New Paltz appointed Scott to a one-year term as an instructor. In 1974, New Paltz reappointed her to another one-year term despite the fact that her department recommended her for at least a two-year appointment. New Paltz also rejected her application for promotion to assistant professor. Scott complained about the one-year appointment and the refusal to promote. (Pl.Exh. 476) Her complaint included an undocumented assertion that other men at New Paltz without a Ph.D. held the rank of assistant professor. She also made an unsupported assertion at trial that most men in the Sociology Department received two-year contract renewals.

New Paltz renewed Scott in 1975 for a two-year term. It also rejected her application for promotion once again, despite recommendations from her department and department chairperson. (Pl.Exhs. 475, 477, and 478) New Paltz reappointed her

again for one-year terms in 1977 and 1978.[14] In 1979, Scott obtained her Ph.D. from the New School for Social Research. Vukasin assured Scott that she could apply for tenure and promotion simultaneously, and that her tenure consideration would not be prejudiced by the fact that she was an instructor. (Def.Exh. E(5)(8)) New Paltz granted Scott tenure and promoted her to assistant professor in 1979.

In 1983, Scott applied for a promotion from assistant to associate professor. Scott, however, chose not to submit her application to the Central Committee on Promotion and Salary Increase. She feared that due to the "political" climate on campus, the Central Committee would recommend against promotion, and she did not want to risk a negative recommendation. New Paltz rejected Scott's application on the ground that she had bypassed the Central Committee, and Scott filed a union grievance. In 1984, Scott reapplied for promotion according to the proper procedures and New Paltz granted it.

New Paltz' explanation for granting Scott short renewal terms and for not promoting her in 1974 and 1975 was that she had not completed her course work for her Ph.D. The record indicates that this explanation is not a pretext: in 1979, after Scott earned a Ph.D., New Paltz promoted and tenured her. Similarly, New Paltz' explanation for not promoting Scott in 1983— that she did not follow proper procedures— is not a pretext, as demonstrated by the fact that when Scott followed the proper procedures in 1984, New Paltz did promote her. Finally, any comparison of salary or rank Scott makes between herself and Sperber or Jacobs is without merit. As described above, both had more experience, more training, and were more accomplished than Scott in the relevant time period.

### C. *Johanna Sayre*

■ Johanna Sayre taught in the German Department at New Paltz from 1969 when she was hired as an instructor until

---

**14.** Scott was not eligible for more than a one-year renewal in 1978, as she was to be considered for tenure in 1979.

1975, one year after New Paltz denied her tenure. She presented evidence that New Paltz discriminated against her in salary and tenure. For the purpose of showing discrimination, she compared herself to Pablo Borau, an assistant professor in the Spanish Department, and Jean Carlo Traverso, an assistant professor in the French Department.

The evidence indicates that Sayre's salary was generally less than Borau's and Traverso's from 1969 to 1975. The differences ranged from a few hundred to a thousand dollars. (Pl.Exh. 589) Traverso's and Sayre's credentials were somewhat similar: neither had a Ph.D. or publications, and both had a similar amount of college teaching experience. (Pl.Exh. 126) Borau's qualifications were also similar to Sayre's. The defendants did not explain the differential. It thus appears that Sayre has demonstrated a possibility that she suffered salary discrimination.

The basis of Sayre's tenure discrimination claim is that in 1974 and 1975, New Paltz considered three faculty members for tenure who did not have a Ph.D.: Traverso, Borau, and herself. New Paltz tenured Borau and Traverso, but not Sayre. The evidence demonstrates that although New Paltz' decision was harsh, it was not discriminatory.

Both the German Department and Dr. Hans Webber, the chairperson of the Department, recommended Sayre for tenure. (Pl.Exhs. 571 and 572) The Department's recommendation stated that Sayre was an effective, dedicated teacher, and noted that she had not yet completed her dissertation. The Department stated that she was making progress and should complete it "in the foreseeable future, i.e., in the next year or so."

The Central Committee on Tenure and Reappointment, however, recommended against tenure, because "the evidence of Mrs. Sayre's work on the dissertation has not indicated significant progress to warrant confidence in its completion within the next academic year." (Pl.Exh. 513) Webber criticized this recommendation because it only considered Sayre's scholarly ability and did not consider growth, teaching, or service. (Pl.Exh. 565)

On June 14, 1974, New Paltz informed Sayre that it would not make a decision about her tenure until August 31, and that New Paltz would ask her to document her progress on the dissertation. (Pl.Exh. 576) On June 17, Jordan Churchill, the New Paltz academic vice-president, confirmed that New Paltz would not make its decision until August 31. He told Sayre that by August 26 she should "supply the President with documentation of progress toward completion of the doctorate together with a specific schedule for completion should the doctorate not be completed by that time." (Pl.Exh. 577)

On August 21, Sayre sent a letter to New Paltz President Stanley Coffman stating that she would complete her dissertation by June of 1975. She also asked for a brief extension of the deadline to provide more specific documentation, because the members of the German Department at Syracuse would be on vacation until August 26. (Pl.Exh. 578) Coffman denied the extension and denied Sayre tenure because she did not have a Ph.D. He considered her letter of August 21 to be unresponsive because she merely made a conclusory statement that she would finish her dissertation. She did not describe how far along she was. He stated there was no basis for granting an extension because she had already had two months to provide the documentation. Sayre was to be terminated at the end of the 1975 academic year.

Sayre completed her dissertation in the spring of 1975 and notified New Paltz. The Central Committee reconsidered its decision to deny tenure and recommended it contingent on a successful dissertation defense. (Pl.Exh. 586) Coffman, however, refused to reconsider. (Pl.Exh. 588) He testified that it was very unusual to do so and that there were severe budgetary pressures, particularly in the foreign language division, not to reverse the decision. Peter Vukaskin, who had replaced Churchill as academic vice-president, testified that reconsideration would have set a bad precedent, as faculty would then think they had

an extra year to earn tenure. Vukasin also was aware that New Paltz had to retrench the German Department in 1976, and Sayre, as the junior faculty member, would be the first to go.

Taverso was up for tenure in 1974 and did not have a Ph.D. Traverso received the recommendation of his department and the department chairperson, and unlike Sayre, the Central Committee recommended Traverso for tenure stating that he was rapidly approaching completion of his doctorate. (Def.Exh. R(5)(4)) The New Paltz Administration also received a letter dated August 5, 1974, from Rev. Robert Sealy, S.J., of the Modern Languages Department at Fordham University, where Traverso was studying. The letter described Traverso's dissertation in detail, praised it, and stated that Traverso had completed one chapter. In light of this information, New Paltz granted tenure to Traverso. Traverso did not receive his Ph.D. until 1977. New Paltz granted tenure to two other faculty members in 1974 who did not have a Ph.D. —one man and one woman—because they provided adequate documentation that they were making progress on their dissertations.

In 1975, New Paltz considered Borau for tenure. He also did not yet have a Ph.D. New Paltz, however, granted him tenure. Vukasin testified that the reason Borau received tenure was that Vukasin received a telegram from the university in Spain where Borau was studying indicating that he had completed his dissertation and that he would be defending it in June.

Based on this evidence, the Court concludes that New Paltz did not discriminate against Sayre. First, she lacked an essential credential for tenure, a Ph.D. Second, New Paltz did not treat her unfairly in relation to Borau and Traverso. Even though neither had a Ph.D., they received tenure because they documented their progress, and Sayre failed to, even though she had the opportunity. Third, in the same year that New Paltz denied tenure to Sayre, it granted tenure to another woman who did not have a Ph.D. because she adequately documented her progress. Fi-

nally, New Paltz' budgetary pressures were real: after Sayre's termination, New Paltz did not ever hire another faculty member to teach German.

### D. *Samantha Joe Mullen*

█ New Paltz hired Samantha Joe Mullen as an instructor in the French Department in 1964, promoted her to assistant professor in 1968, tenured her in 1972, and retrenched her in 1976. Mullen asserts discrimination in salary and termination.

For purposes of showing salary discrimination, Mullen compared herself to Traverso and another faculty member in the French Department, Albert Nahon. From 1969 to 1973, Mullen's salary was higher than Traverso's. (Pl.Exh. 791) In 1974, Traverso's salary exceeded Mullen's by $227. Nahon's salary was $1,000 more than Mullen's. All three faculty members held the same rank, Mullen was senior to both of them, and only Mullen held a Ph.D. Mullen received a merit increase of $300 and an equity adjustment of $450 in 1975. (Pl.Exh. 792) These increases did not satisfy Mullen that the differential had been remedied.

Based on the evidence before the Court, it appears that Mullen has demonstrated pay discrimination. Her qualifications were superior to those of Traverso and Nahon, and defendants have presented no evidence to explain the difference.

█ On the other hand, the evidence indicates that New Paltz did not discriminate against Mullen when it retrenched her. New Paltz decided to retrench a line in the French Department in 1976. New Paltz thought that Mullen and Nahon, the junior tenured members of the French faculty, both had been tenured in 1972. In such circumstances, the New Paltz president has discretion in deciding whom to retrench. President Coffman chose to retrench Nahon. However, when New Paltz informed the SUNY administration of its decision, SUNY rejected it, and required New Paltz to retrench Mullen. Unknown to New Paltz, Nahon had won a grievance in 1973 which changed the effective date of his tenure for sabbatical and retrenchment

purposes to 1971. (Def.Exh. F(6)(1)) Mullen was thus junior to Nahon, and had to be retrenched instead of him.[15] Since New Paltz wanted to retrench Nahon but was forced to retrench Mullen, it did not intentionally discriminate against Mullen when it retrenched her against its will.

## VI. INDIVIDUAL TITLE VII CLAIMANTS

### A. *Roberta Ottaviani*

New Paltz hired Roberta Ottaviani as an instructor in the Speech Department in 1967. New Paltz denied her tenure in 1973, and terminated her in 1974. Ottaviani presented evidence in support of five claims at trial: discrimination in salary, rank, promotion, duration of contract renewals, and tenure. For the following reasons the Court finds her claims without merit.

#### 1. Tenure

In order to prove a prima facie case of tenure discrimination, a plaintiff must establish that: 1) she was a member of a protected group;[16] 2) she was qualified for tenure; and 3) she was denied tenure in circumstances permitting an inference of discrimination. *Zahorik v. Cornell University*, 729 F.2d 85, 92 (2d Cir. 1984). A plaintiff may show she is qualified for tenure by proving that "some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question." *Id.* at 93–94. Plaintiff must demonstrate she is qualified for lifetime employment, not merely that she is qualified to continue as a non-tenured faculty member. *Liberman*, 630 F.2d at 64. Methods of showing an inference of discrimination include departures from procedural regularity or conventional evidence of bias. *Zahorik*, 729 F.2d at 93.

If plaintiff establishes a prima facie case, the burden of production is shifted to the defendants to "bring forth evidence that they acted on a neutral basis." *Lieberman*, 630 F.2d at 65. Defendants may satisfy this burden by providing testimony, with whatever supporting evidence deemed desirable, that plaintiff's scholarly ability, mastery of subject matter, or professional growth was not sufficient to merit tenure. *Id.* at 65–66.

Once the defendant articulates a neutral basis for the tenure denial, the burden falls to the plaintiff to show that the reason was a pretext. *Namenwirth v. Bd. of Regents of the University of Wisconsin*, 769 F.2d 1235, 1240 (7th Cir.1985), *cert. denied*, 474 U.S. 1061, 106 S.Ct. 807, 88 L.Ed.2d 782 (1986). In doing so, evidence of a comparative nature, such as the fact that similarly situated males were granted tenure, is appropriate. *Id.* Nevertheless, in assessing such comparative evidence, the Court must be wary not to intrude on the prerogative of a college to tenure whom it deems appropriate. *Lieberman*, 630 F.2d at 67–68. A plaintiff may also show pretext by showing that defendant's explanation is not worthy of belief, *Namenwirth*, 769 F.2d at 1240, or not logical, *Zahorik*, 729 F.2d at 94.

##### a. *Prima facie case*

In order to qualify for tenure at New Paltz, a candidate must satisfy the five criteria of the Board of Trustees: mastery of subject matter; effectiveness in teaching; scholarly ability; effectiveness of University service; and continuing growth. (Joint Pre–Trial Order, Statement of Undisputed Facts, ¶ 36) A number of different committees and individuals review each candidate according to these criteria, and provide recommendations. The New Paltz president makes the ultimate decision.

The Speech Department's Subcommittee on Tenure and Promotion recommended Ottaviani for tenure. (Pl.Exh. 464) The Subcommittee stated that Ottaviani met each of the five criteria as follows: 1) mastery of subject matter—Ottaviani held an M.A. in speech pathology and a Certificate of Clinical Competence in speech pathology;

---

**15.** Nahon himself was retrenched in 1979. (Def. Exh. S(5)(3))

**16.** There is no issue regarding Ottaviani's membership in a class protected by Title VII.

2) effectiveness in teaching—students judged Ottaviani an effective teacher, and she was well organized and dedicated to her students; 3) service—Ottaviani was chairperson of the SUNY Caucus on Women's Rights and Chairperson of the SUNY Faculty Senate Committee on Fair Employment Practices; 4) and 5) scholarship and growth—Ottaviani attended various workshops and was studying for a doctorate at the University of Michigan.

The chairperson of Ottaviani's department, Perry Baisler, also recommended tenure. (Pl.Exh. 421) Regarding scholarly growth and mastery of subject matter, Baisler indicated that Ottaviani was enrolled at Michigan as a "pre-candidate" for a Ph.D. in speech and that she had earned 8 credits with a B+ average. She had also recently attended a course on voice disorders. Baisler also stated that Ottaviani's colleagues felt she was an effective teacher, and prepared careful course outlines and materials. Finally, Baisler stated that Ottaviani had a very deep commitment to equal rights for women, and by supporting women's causes had made a considerable contribution to SUNY and New Paltz.

The Central Committee on Tenure and Reappointment, however, recommended denying tenure to Ottaviani. (Pl.Exh. 422) The basis for the recommendation was that Ottaviani's file demonstrated limited evidence of professional growth and that her actual progress on her Ph.D. during the previous six years did not suggest any firm commitment to pursue it with diligence.

The evidence is clear that Ottaviani's record of scholarship, growth, and mastery of subject matter was weak. She had only eight credits toward a Ph.D., no publications, and participated in very few professional seminars. Nevertheless, since the Speech Department and Dr. Baisler recommended tenure, the Court will give Ottaviani the benefit of the doubt and find that for the purpose of proving a prima facie case, Ottaviani was qualified for tenure. *See Zahorik*, 729 F.2d at 95 (case for tenure stronger since department and an *ad hoc* committee recommended plaintiff for tenure).

There is evidence, albeit weak, from which the Court can infer discriminatory motive. Ottaviani testified that the chairperson of the Central Committee said he thought Ottaviani was hired because she was "cute". Ottaviani testified that another member of the Committee stated that her activities on behalf of women's rights should not be considered as university service. There is also evidence in the record that various faculty members considered Ottaviani an irritant because of her work for women's rights.[17] New Paltz also had previously tenured male members of the Speech Department who did not hold a Ph.D.[18] Ottaviani has thus proved a prima facie case of tenure discrimination.

### b. *Defendants' explanations*

President Coffman testified that he denied tenure to Ottaviani because she had done so little work toward earning her Ph.D. during her six years at New Paltz—she had earned only 8 credits when Coffman made his decision to deny tenure—that there was no evidence she would obtain it. He was also disturbed that she had not responded earlier to the Administration's numerous warnings to obtain a Ph. D.[19]

Coffman's basis for determining that Ottaviani required a Ph.D. to have mastery over her subject was sound. Coffman sought advice from Dr. Baisler, who informed him that a Ph.D. is considered the terminal degree in Ottaviani's field. (Pl. Exh. 433) Vukasin, who was not the academic vice president at the time but who was familiar with the decision, also testified that Ottaviani had not demonstrated to

---

**17.** There is no claim or evidence that New Paltz denied tenure to Ottaviani in retaliation for her activity on behalf of women's rights.

**18.** This evidence will be discussed more fully in the Court's discussion of Ottaviani's proof of pretext.

**19.** These warnings will be discussed in the Court's discussion of discrimination in promotion, *infra,* at Section V. A. 2.

New Paltz that she had embarked on a directed and organized program towards obtaining a Ph.D. The defendants have thus articulated a neutral basis for denying tenure to Ottaviani.

### c. *Pretext*

Ottaviani attempted to show that defendants' explanation was pretextual in two ways. First, she presented evidence that New Paltz was wrong in thinking she had not made sufficient progress toward obtaining a Ph.D. Second, she attempted to prove that two males in the Speech Department—Fred Maulucci and Donald Wildy—had made similar progress yet received tenure.

Ottaviani registered in the graduate program at the University of Michigan in the summer of 1972. (Pl. Exh. 311) She earned 8 credits that summer, and was listed as a "pre-candidate", which indicates that Michigan had not yet approved a course of study for a doctorate. (Pl. Exh. 312) Ottaviani registered for 8 more credits at Michigan in the summer of 1973, and was still listed as a "pre-candidate". (Pl. Exh. 313) Ottaviani also registered for a statistics course at SUNY–Albany in the fall of 1973. (Pl. Exh. 465) In September of 1973, Michigan approved Ottaviani's plan of study for a Ph.D. (Pl. Exhs. 314 and 491)

At the time New Paltz was considering Ottaviani's tenure application in the spring of 1973, however, she had attended Michigan for only one summer, earned only 8 credits, was a "pre-candidate", and had not yet developed an approved Ph.D. plan. This is the evidence of progress toward the doctorate that New Paltz actually had before it when it decided to deny tenure.

After the tenure denial, Ottaviani sought reconsideration and submitted additional evidence: her 1973 Michigan transcript and a letter of acceptance from SUNY Albany. (Pl. Exhs. 429 and 465) She did not submit proof that she was a formal Ph.D. candidate at Michigan. Coffman, with the concurrence of the vice-president for academic affairs, refused to reconsider her case. He stated in a letter: "I do not believe ... we can do what we would essentially be doing in your case, which is awarding tenure to a person almost exclusively for University service and with little regard to progress toward the degree, which represents the initial base for establishing professional competence." (Pl. Exh. 434)

The Court finds that New Paltz reasonably believed Ottaviani would not complete her doctorate, because the evidence that she would was very weak. Coffman's determination that Ottaviani had not made sufficient progress toward earning a Ph.D. is reasonable. Coffman was an experienced college administrator and testified based on his experience that faculty who had made little progress toward earning a Ph.D., and who made that progress only when the tenure decision was approaching, were unlikely ever to earn the Ph.D. The Court credits this testimony.

In 1970, New Paltz granted tenure to Donald Wildy, a male member of the Speech Department. At the time, Wildy did not have a Ph.D., but had earned 51 credits toward the degree. He had also received a fellowship the previous year from the City University of New York to pursue his studies, and had spent an entire year there. Since Wildy had progressed on his Ph.D. much further than Ottaviani had, the fact that he received tenure without holding a Ph.D. does not demonstrate that New Paltz' reason for denying tenure to Ottaviani was pretextual.

In 1975, New Paltz granted tenure to Fred Maulucci, another male in the Speech Department who did not hold a Ph.D. Three factors differentiate Maulucci from Ottaviani so as to render a comparison unfruitful.

First, New Paltz determined, based on the evidence before it, that Maulucci had made sufficient progress toward earning a Ph.D. Baisler sent a letter to Vukasin stating that Maulucci had earned 64 graduate credits, had embarked on a formal doctoral program at Pennsylvania State University, and had completed a qualifying examination. (Def. Exh. A(6)(3)) Maulucci also submitted a statement which indicated he had earned a total of 64 post-Masters

credits. He earned 48 credits prior to admission to Penn State's doctoral program in 1972, 40 credits at Penn State, and 24 credits at other SUNY colleges. Based on the recommendation from Baisler, Coffman reasonably thought that all 64 credits counted toward Maulucci's doctorate.[20] Vukasin testified that he was also convinced of Maulucci's progress by the fact that he proposed a specific plan for completion of the Ph.D. (Def. Exh. A(6)(4))

Second, Maulucci held a joint appointment in the Speech Department and the campus school, with one-third of his time assigned to the campus school. His main duty at the campus school, directing the remedial speech program, did not require a Ph.D. (Def. Exh. A(6)(3), recommendation of the Central Committee) In the Speech Department, his main responsibilities were supervising and coordinating student teachers and serving as a clinician in the College Speech Clinic.[21] Baisler was adamant that a Master's degree was a sufficient terminal degree for this. (Def. Exh. A(6)(3), recommendation of Perry Baisler). The Central Committee disagreed. (Def. Exh. A(6)(3)) Nevertheless, these exhibits show that Baisler, the Speech Department, and the Central Committee were optimistic about Maulucci's prospects for earning a Ph.D., more so than they had been about Ottaviani.

Unlike Ottaviani, Maulucci received the recommendation of every committee and person which considered his tenure application. In Maulucci's case, this included recommendations from the Dean of Education, the Subcommittee on Tenure from the Campus School, and the principal of the Campus School. (Def. Exhs. A(6)(3) and A(6)(4)) The recommendations from Baisler and the Speech Department were especially strong.

Finally, defendants offered comparative evidence that the reason for denying tenure to Ottaviani was not pretextual. In 1973, New Paltz denied tenure to Robert Grosshans, a male member of the Speech Department, on the grounds that he had not made sufficient progress toward obtaining a Ph.D. Like Ottaviani, Grosshans had received the recommendation of the Speech Department and Baisler, but did not receive tenure. (Pl. Exh. 437)

### 2. Promotion

■ Ottaviani applied for promotion from assistant to associate professor in 1973, and New Paltz denied the promotion. Ottaviani claims that New Paltz denied the promotion due to sex discrimination. The *Zahorik* tenure discrimination test, described *supra*, is properly applied to a claim of promotion discrimination. *Chang,* 606 F.Supp. at 1253. The Court finds that Ottaviani has failed to prove a case of promotion discrimination under this test.

New Paltz evaluates applications for promotion according to the same five criteria it uses for tenure decisions. The same cast of characters reviews applications for promotion with one exception: the Central Committee on Promotion and Salary Increases replaces the Central Committee on Tenure and Reappointment.

Ottaviani applied for promotion from assistant to associate professor in 1971, 1972, and 1973, and New Paltz rejected her application each time. In 1971, Dr. Baisler recommended against promotion because Ottaviani had not made substantial progress toward her doctorate. (Def. Exh. P(1)(23)) Baisler stated, "I think Mrs. Ottaviani understands that in my opinion her continued academic advancement will depend in a large measure upon further formal study in her discipline." The Speech Department also recommended against promotion on the basis that Ottaviani had not adequately demonstrated progress toward obtaining a Ph.D. (Pl. Exh. 445) The Department made clear that it had previously told Ottaviani of the need to demonstrate progress toward obtaining a Ph.D. if she expected promotion. In 1972, Baisler and the

---

**20.** Maulucci testified at trial that only 25 of his post-Master's credits counted toward a Ph.D. Nevertheless, Coffman reasonably believed that all 64 credits counted, and justifiably based his decision on this.

**21.** Ottaviani did not teach clinical courses when she was considered for tenure. She taught academic courses.

Speech Department once again recommended against tenure on the same grounds: lack of progress toward a doctorate. (Pl. Exh. 446 and Def. Exh. P(1)(21))

In 1973, the Speech Department recommended promotion because Ottaviani had registered in a Ph.D. program and had made progress toward earning the degree. (Pl. Exh. 447) Baisler recommended against promotion, once again due to lack of progress toward the doctorate. (Def. Exhs. P(1)(14) and P(1)(16)) The Central Committee on Promotion and Salary Increase concurred with Baisler. (Def. Exh. P(1)(15))

Ottaviani has failed to demonstrate that she was qualified for promotion to associate professor. In 1971 and 1972, her department and its chairperson, after careful consideration of her qualifications, recommended against tenure. In 1973, the Speech Department changed its recommendation, but Baisler and the Central Committee continued to recommend against tenure. The basis for the Speech Department's change of heart—that Ottaviani had registered in a Ph.D. program—does not convince the Court that her qualifications had changed sufficiently to merit promotion.

Even had Ottaviani proved a prima facie case, New Paltz articulated a neutral basis for the denial of promotion: lack of progress toward a Ph.D. Ottaviani attempted to prove pretext with comparative evidence. Wildy was promoted to associate professor in 1970 and Maulucci was promoted to associate professor in 1982, both without a Ph.D. However, Wildy had progressed much further toward a Ph.D. than Ottaviani had. Maulucci was promoted as a reward for preparing and securing approval for a Master's program in communication disorders, a project New Paltz had been working on for ten years.

### 3. Duration of Renewals

■ Ottaviani received a one-year contract from New Paltz in 1967. After that, she was eligible for reappointment for a term of one to three years. Ottaviani re-

ceived a one-year contract renewal in 1968, a two-year renewal in 1969, and one-year renewals in 1970, 1971, and 1972.[22] She claims that New Paltz should have granted her contract renewals for at least two years, and that their failure to do so was discriminatory.

Ottaviani failed to prove that she was qualified for a two-year contract renewal. In 1970 and 1971, the Speech Department and Dr. Baisler recommended one-year reappointments. (Pl. Exhs. 302, 497, and 499; Def. Exh. P(1)(34)) The basis for the recommendation was that she had not made sufficient progress toward her Ph.D. to warrant a longer appointment.

Ottaviani asserted that her one-year renewals were discriminatory because Maulucci received two-year reappointments in 1970, 1972, and 1974. The Speech Department recommended Maulucci for two-year renewals despite the fact that he did not have a doctorate. (Pl. Exh. 498) The two-year renewals he received were in recognition of his great value as a faculty member. He served in both the campus school and the Speech Department, and coordinated the Department's student teaching program.

### 4. Initial Rank

■ Ottaviani was hired as an instructor; Maulucci as an assistant professor. Ottaviani claims that the difference in rank is due to sex discrimination. This claim is without merit. Maulucci's qualifications for his job when hired were superior to Ottaviani's for her job when she was hired. Maulucci held a Certificate of Clinical Competency, Ottaviani did not. He had more non-college teaching experience than Ottaviani. New Paltz also felt that Maulucci was more highly qualified for his responsibilities at New Paltz—supervising student teachers—because he had a number of years of experience doing so. This explanation is not pretextual, since New Paltz hired Donald Wildy, who did not have a Ph.D., as an instructor.

---

**22.** The maximum contract renewal Ottaviani could receive in 1972 was one year because she was scheduled to be considered for tenure the next year.

### 5. Salary discrimination

Ottaviani presented evidence that her annual salary was consistently lower than Maulucci's and Wildy's. She claims that the discrepancy is due to sex discrimination. Since all three faculty members were members of the Speech Department, this discrepancy is evidence of discrimination. *Merrill v. Southern Methodist University*, 806 F.2d 600, 606–07 (5th Cir.1986).

Nevertheless, the evidence indicates that the salary differences were due to a legitimate factor—Wildy and Maulucci were more qualified than Ottaviani. Both were further advanced in their Ph.D. studies. Maulucci's qualifications have already been described. Wildy, whom New Paltz hired to teach courses in speech and dramatic presentation, was also more qualified than Ottaviani in his field. He had directed a drama program for one year at SUNY–Buffalo, directed twelve plays, acted in twelve plays, given four studio performances, and taught high school for five years.

### B. *Dorothy Jessup*

New Paltz hired Dorothy Jessup in 1973 as an assistant professor in the Sociology Department. In 1977, New Paltz President Stanley Coffman denied tenure to Jessup. Jessup appealed this decision through the SUNY grievance procedure, and SUNY Chancellor Clifton Wharton overturned the decision and ordered that Jessup be appointed as a visiting assistant professor for two years and reconsidered for tenure after that. In 1979, New Paltz granted tenure to Jessup. She claims that the 1977 denial was due to sex discrimination.[23] For the following reasons the Court finds her claims are without merit.

### 1. Prima facie case

Applying the *Zahorik* test for tenure discrimination, there is no question Jessup is a member of a group Title VII protects.

The record also contains evidence which shows that Jessup was qualified for tenure under the *Zahorik* standard. The chairperson of the Sociology Department, Dr. Vanderlyn Pine, the tenure subcommittee of the Sociology Department, and the Central Committee on Tenure and Reappointment all recommended Jessup for tenure. (Pl. Exhs. 102, 386, 387, and 487)

The favorable recommendations were not without qualification. Dr. Pine noted two criticisms of Jessup's teaching effectiveness: at times she was disorganized and confusing, and on occasion she required too much work from the students. Dr. Pine felt that Jessup was improving. Dr. Pine also stated that Jessup's publication record was not strong but she had recently submitted an article for publication to the *Sociology of Education* ("the journal"). Dr. Pine stated that the journal had rejected the article, but had asked Jessup to revise and resubmit it. Dr. Pine was optimistic that the journal would accept the revised article for publication.

The Sociology Department recommended Jessup for tenure "[w]ith departmental division and some reservations...." (Pl. Exh. 386) The Department's vote was 6–4–1 in favor of tenure. The recommendation stated that Jessup was popular with students and especially dedicated to students with poor academic backgrounds. The Committee also stated that Jessup was willing to acknowledge and correct shortcomings in her pedological efforts.

The record also contains evidence which raises a suggestion of discrimination. Pursuant to a grievance Jessup filed with the affirmative action officer charging discrimination, an ad hoc affirmative action grievance committee found a possibility that her tenure denial was due to sex discrimination. (Pl. Exh. 99) Furthermore, in response to Jessup's complaint alleging sex discrimination, the SDHR found probable cause to believe that New Paltz had discriminated against Jessup. (Pl. Exh. 98)

---

**23.** Jessup also claims that her salary was lower than other males due to sex discrimination. The evidence shows, however, that as soon as she requested a salary increase, New Paltz granted Jessup a raise of $1,125, which, she testified, satisfied any salary inequity. Thus, even if her salary was lower than comparably placed males, New Paltz quickly remedied the discrepancy, and there is no evidence that Jessup suffered any harm.

### 2. New Paltz' explanation

Coffman explained the reasons for the denial in a letter to Jessup dated August 31, 1977. (Pl. Exh. 105) First, Coffman stated that Jessup's scholarly record was weak. Her only publications were a contribution to an edited volume and a book review. Coffman was critical of the article Jessup had submitted to the *Sociology of Education:* it had not been accepted; it was an elaboration of her dissertation; and it had seemingly been published solely under the pressure of tenure. Second, the reports on Jessup's teaching were "mixed". In her favor were her dedication and willingness to work with students who had poor academic records. Against her were poor command of subject matter, organization, and clarity of presentation. Third, Coffman stated it was "not unimportant" that a significant proportion of the members of the Sociology Department concluded that Jessup had not satisfied tenure standards.

Coffman testified at trial that he examined Jessup's file very carefully before reaching his conclusion. The information in Jessup's file clearly indicated that her article had not yet been accepted for publication. While Pine and the Speech Department both were optimistic about the article's eventual publication, Coffman had a different view, based primarily on letters Jessup received from *Sociology of Education* on December 23, 1976 and May 4, 1977. (Def. Exhs. O(5)(12) and Q(5)(11)) The letter of December 23, 1976 states that while the paper had merit, it is "far too long, and containing too much material, tabular as well as verbal, which turns the reader away from your main points." The letter suggested a "major overhaul of the paper" which would include eliminating footnotes, clarifying "extremely misleading" figures, rewriting the manuscript, and cutting it in half. The letter invited Jessup to revise and resubmit the article. Jessup did so, and the letter of May 4, 1977 stated that the revised paper was a "substantial improvement" but needed a "substantial reorganization". The letter concluded that the journal believed Jessup would "have something publishable on the next round...." Coffman's judgment that the response from the journal to Jessup's article was not positive, which was based on his considerable experience, is a reasonable one.

Vukasin recommended to Coffman that he deny tenure to Jessup. His main reason for doing so was lack of publications and mixed teaching reviews. Vukasin also testified that he read her article, and was not impressed because it was a rehash of Jessup's dissertation and made self-evident conclusions. It is also clear that Vukasin gave much thought to his recommendation, and found it one of the most difficult he had to make.

"[D]eficient scholarship is a legitimate, non-discriminatory reason to deny ... tenure." *Lynn v. Regents of the University of California,* 656 F.2d 1337, 1344 (9th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982). Coffman's and Vukasin's testimony that Jessup's scholarship was inadequate to merit tenure satisfies New Paltz' burden of production. *Lieberman,* 630 F.2d at 65. Similarly, mixed teaching reviews are also a legitimate basis for denying tenure, and the record indicates that Jessup had mixed reviews.

### 3. Pretext

Jessup's attempt to show pretext has two parts: 1) New Paltz' explanation is not worthy of belief because an ad hoc committee which reviewed her union grievance determined that she was entitled to tenure; and 2) an ad hoc affirmative action committee which investigated her affirmative action grievance concluded that New Paltz possibly discriminated against her.

Pursuant to her right under the union contract, Jessup filed a grievance about the tenure denial with the SUNY chancellor. After she filed her grievance, the Chancellor convened an ad hoc advisory committee, composed of one member selected by Jessup, one by New Paltz, and one by both of them. The Committee conducted an extensive investigation which included a review of all the documentary evidence and inter-

views of the relevant faculty and administrators.

The committee issued its report on December 13, 1977, and, by a vote of 2–1, recommended that Jessup be granted tenure. (Pl. Exh. 307) The Committee did not observe Jessup while teaching, but based on their interviews, concluded that she was an effective teacher. The Committee also reviewed Jessup's scholarly ability. By that time the *Sociology of Education* had accepted Jessup's article for publication, and based in large part on this, the committee concluded that she had demonstrated sufficient scholarly ability.

Despite this report, the Court finds that Coffman's and Vukasin's decision was justified. First, when New Paltz informed Jessup that it denied her tenure on August 1, 1977, her article had not yet been accepted, and Coffman reasonably believed that it would not be. Even if the article had been accepted when New Paltz was considering Jessup, or even if Coffman's belief that it would not be was unreasonable, Vukasin's judgment, which the Court accepts, was that the article was not of sufficient quality to merit tenure.[24] Second, the Committee's review of New Paltz' decision was *de novo:* it simply determined whether or not Jessup was entitled to tenure based on its own investigation and judgment. The Court, however, is not determining whether Jessup was entitled to tenure, but whether she was qualified, and if so, whether the decision denying her tenure was reasonable, non-pretextual, and non-discriminatory. The Court concludes that it was.

Finally, the Committee's perspective on this decision is different from the Administration's. While the Committee was concerned with a single tenure decision, New Paltz was concerned with the implication of its decision for the faculty and future tenure decisions. Vukasin testified that he was attempting to improve the scholarly productivity of the New Paltz faculty, and denying tenure to those faculty who did not publish was a means of doing this. The

Committee also was not making a long term commitment to Jessup, while New Paltz would be. Once again, the Court is unwilling to interfere with Vukasin's and Coffman's considered judgment that it would be unwise to make such a commitment to a faculty member with mixed teaching reviews and limited scholarly ability.

Jessup also filed a grievance with Lorraine Bagley, who found no evidence of sex discrimination. (Pl. Exh. 93) Jessup pursued her affirmative action grievance to the next step, forming an ad hoc affirmative action grievance committee. In a report issued April 24, 1978, the Committee found that "sex discrimination has possibly occurred in the decision to deny tenure to Dr. Dorothy Jessup." (Pl. Ex. 99) The Committee found that the credentials of Dr. Charles Leinenwebber, a professor in the Sociology Department who received tenure in 1973, and Jessup's, were equal.

The evidence in this case indicates that the fact that New Paltz tenured Leinenwebber is not evidence that its explanation for denying tenure to Jessup was pretextual. Coffman and Vukasin testified that Leinenwebber was a superior scholar. He had already published six articles and another had been accepted for publication.

Defendants themselves presented evidence that their explanation for not tenuring Jessup was legitimate. In the same year, New Paltz also denied tenure to Warren Fish, a male member of the Geography Department. Like Jessup, Fish received positive recommendations from his department, department chairperson, and the Central Committee. Also like Jessup, New Paltz denied tenure to Fish because he had no publications. Like Jessup, Fish pursued a union grievance, received a two-year appointment as a visiting professor, and ultimately received tenure. Jessup's claim of tenure discrimination is without merit and is dismissed.

---

24. Vukasin is an economist and as a social scientist is qualified to comment on the quality of Jessup's article.

### C. *Joan Marie de la Cova*

New Paltz hired Joan Marie de la Cova in 1973 as an instructor in the Spanish Department. Her starting salary was $10,500. She had a Master's degree and was enrolled in a Ph.D. program at Columbia University. New Paltz granted de la Cova two-year contracts in 1975 and 1977. In 1978, the year before she was eligible for tenure, New Paltz informed de la Cova that it would not renew her contract in 1979 for budgetary reasons. de la Cova claims that New Paltz discriminated against her in termination, salary, promotion, and initial rank.

#### 1. Termination

■ de la Cova's qualifications for renewal are not in issue. New Paltz terminated de la Cova for budgetary reasons, not because she was not qualified for renewal. Even if de la Cova's qualifications were in issue, she would satisfy the *Zahorik* test: the Spanish Department, its chairperson, the Central Committee, and the Women's Studies Program all recommended a one-year renewal. (Pl. Exhs. 610, 611, 632, and 635) Once New Paltz terminated de la Cova only one woman was left in the Spanish Department, raising an inference of discrimination. de la Cova has thus established a prima facie case.

New Paltz has articulated a neutral basis for the termination. SUNY informed New Paltz in 1978 that it would lose a number of lines in 1979. Vukasin, who was acting president in the spring of 1978, decided to attempt to avoid retrenchment in 1979 by non-renewing a number of contracts on budgetary grounds in 1978.[25] Vukasin decided to eliminate one line in the Spanish Department because student enrollment was decreasing and it was overstaffed. Vukasin explained this to de la Cova in a letter dated August 21, 1978. (Pl. Exh. 618) The record indicates that Vukasin carefully reviewed each faculty member whose contract was due for renewal in 1978, assessed the student enrollment trends in his/her department as well as the

department's programmatic needs, and made his decisions as to which lines to cut accordingly. This considered judgment is entitled to the Court's deference.

de la Cova claims that New Paltz could have terminated Edgar Rodriguez, a junior faculty member with a dual appointment in the Spanish and the Elementary Education Departments, instead of her. New Paltz, however, had many legitimate reasons for terminating de la Cova instead of Rodriguez. Rodriguez was a valuable and unique faculty member. First, Rodriguez held a half-line in each of the Spanish and Elementary Education Departments. If New Paltz terminated Rodriguez, it would have eliminated only half a line from Spanish and would have had to devise a way to eliminate another half line. Second, Rodriguez was the director and sole faculty member in the Bilingual Education Teacher Training Program in the Elementary Education Department. In this position, he was responsible for applying for and administering approximately $100,000 in grants per year. The Program was also popular, and New Paltz did not want to interfere with it. Third, Rodriguez was one of three Puerto Rican faculty members at New Paltz. Puerto Rican students relied on him for counsel and assistance. Rodriguez was also a native Spanish speaker, which gave him an advantage over non-native speakers in teaching Spanish courses for native speakers.

#### 2. Salary

■ de la Cova's starting salary was $10,500, and it rose to approximately $13,000 by the time she left New Paltz. Rodriguez' starting salary was $12,500, and it remained higher than de la Cova's throughout the relevant time period. de la Cova claims the reason for the salary difference is sex discrimination. The evidence shows otherwise. First, Rodriguez' field of bilingual education was new, with few qualified applicants. New Paltz hired him only after a long search. Second, Rodriguez bargained for a higher salary, and there is no

---

**25.** This decision and the ultimate non-renewals are discussed in the section about Samantha Joe Mullen.

evidence that de la Cova did. Third, as described above, Rodriguez' varied responsibilities made him more valuable than de la Cova to New Paltz.

### 3. Initial rank

 de la Cova's initial rank was instructor, Rodriguez' was assistant professor. She claims this difference is due to sex discrimination. Once again, the evidence demonstrates otherwise. Neither de la Cova nor Rodriguez held a Ph.D. when hired. New Paltz' standard practice at the time was to hire such faculty as instructors. The New Paltz Administration wanted to hire Rodriguez as an instructor, but through the insistence of Lorraine Bagley and the bargaining of Rodriguez, it made an exception for Rodriguez. The reason for the exception is that Rodriguez' field of bilingual education was new, and Rodriguez, holding a Master's degree in Biglingual Education, was as highly qualified as other candidates. (Pl. Exh. 714) New Paltz determined that assistant professor was the appropriate starting position for a person with Rodriquez' qualifications.

### 4. Promotion

 de la Cova applied for a promotion in 1977 after she had completed her course work in her Ph.D. program. Her department, its chairperson, and the Central Committee on Promotion and Salary Increase made positive recommendations. New Paltz, however, rejected the application. Its reason for doing so was neutral and not pretextual. The SUNY budget division, having concluded that the New Paltz faculty was "top heavy" in rank, had imposed severe promotion quotas on New Paltz shortly before de la Cova's application. New Paltz opposed this, but to no avail. New Paltz did not promote de la Cova because she was not, without a doctorate, deserving of one of the few opportunities for promotion. de la Cova's complaint is without merit and is dismissed.

### D. *Carolee Schneeman*

 Carolee Schneeman is an accomplished artist whom New Paltz hired as a part time faculty member to teach filmmaking in the spring of 1977. She taught at New Paltz for a total of three semesters and was terminated after the spring, 1978 semester. She claims that she was the victim of sexual harassment in the terms, conditions, and privilege of employment in violation of Title VII. *See Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2406–07, 91 L.Ed.2d 49 (1986). In order to prove her claim, Schneeman must show that: 1) she belongs to a group protected by Title VII; 2) she was subject to sexual harassment; 3) it would not have occurred if she were not female; 4) the harassment affected a term, condition, or privilege of employment; and 5) her employer knew or should have known of the harassment but failed to take action. *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir.1982).

 At trial, Schneeman complained of the following incidents: 1) the film lab had no editing bins and her department refused to provide them; 2) she did not have an office, telephone or secretary while other men in her department did; 3) one of the cameras she used for her classes broke and the department blamed it on her and asked her to pay for it; 4) a faculty member asked her to sweep up cigarette butts that her students had dropped in the hall; 5) her students had difficulty with access to her classroom at night; and 6) her department chairperson asked her to give a party with artists in the community for a visiting filmmaker.

Incidents 1, 3 and 5 are unfortunate, but have no relation to Schneeman's gender. Incident 2, on its face, is related to gender, but the only evidence in the record demonstrates that part-time faculty in the art department did not have offices, and all the male faculty with offices had full-time positions. Incident 4 can be construed as related to gender but is at best an isolated incident. There is no evidence that cleaning the halls was part of Schneeman's duties. Incident 6 is also possibly linked to gender, but the evidence indicates that Schneeman lived in New Paltz, and was thus well suited to invite community artists

to a party. Considering all the alleged incidents of harassment as a whole, there is no showing of sexual harassment. The evidence also indicates that Schneeman did not report any of these incidents to the affirmative action office, the president, or the academic vice-president. Schneeman's claim is without merit and is dismissed.

## VII. HARRIET KLAPPER'S CLAIMS

Harriet Klapper alleges that the defendants violated the Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA") as to her. She also claims that the conditions of her employment were such that she was constructively discharged.

Defendants move to dismiss the claim of constructive discharge because Klapper never filed a claim with the EEOC or SDHR. The basis of Klapper's constructive discharge claim is that salary discrimination against her forced her to resign. Since salary discrimination is one of the class claims, defendants' motion is denied.

■■■■ The defendants also move to dismiss Klapper's EPA claim as barred by the statute of limitations. The applicable statute of limitations, 29 U.S.C. § 255(a), requires that actions under the EPA must be brought within two years, or three years if the violation was willful. The payment of a discriminatory wage is a violation which begins when the wage is set and continues with the receipt of each discriminatory paycheck. *Derouin v. Louis Allis Div.*, 618 F.Supp. 221, 223 (D.Wisc.1984); *Jenkins v. Home Ins. Co.*, 635 F.2d 310 (4th Cir.1980). Klapper filed her complaint on February 3, 1982, while she was still employed at New Paltz and receiving a salary from New Paltz. Her claim is thus timely.

### A. *Equal Pay Act: Elements*

■■■■ The Equal Pay Act prohibits employers from paying higher wages to men than women "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions...." 29 U.S.C. § 206(d)(1). The

plaintiff has the burden of proving that she was paid less than a man doing equal work. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed. 2d 1 (1974); *Mazzella v. R.C.A. Global Communications, Inc.*, 642 F.Supp. 1531, 1551 (S.D.N.Y.1986), *aff'd*, 814 F.2d 653 (2d Cir.1987). If the plaintiff establishes a prima facie case, the burden shifts to the employer to show that the wage differential is justified under one of the four statutory exceptions: a merit system, a seniority system, a system which measures quality or quantity of production, or a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1)(i)–(iv). *See Corning Glass*, 417 U.S. at 196, 94 S.Ct. at 2229; *Mazella*, 642 F.Supp. at 1551. Klapper, who was a faculty member in New Paltz' Department of Economics and Business, claims that she was paid less than two male faculty members in the same department whose jobs were equal to her job: Fred Zeitler and Donald Wilen.

### B. *Prima facie case*

#### 1. Salary levels

The evidence regarding Klapper's, Wilen's, and Zeitler's salaries is confusing and contradictory. The trial testimony, exhibits, and the computerized payroll data sheets (Def. Exh. 67) each demonstrate different salaries. The Court resolved these conflicts and determined the salaries in the following way. First, the Court determined the starting salary of each faculty member. This was relatively easy, as it was always included in New Paltz' offer letters, which were either introduced into evidence or identified and used to remind a witness. Second, as described above, a New Paltz faculty member's salary was made of two components: annual across-the-board increases and discretionary increases. The evidence showed that during the relevant time period all New Paltz faculty members received an annual seven percent cost-of-living salary increase, and that Klapper received two discretionary increases, Wilen received one, and Zeitler

received none.[26] The Court thus calculated each faculty member's salary by adding seven percent increases each year to the starting salary and then adding any discretionary increases.

The annual salaries of Klapper, Zeitler, and Wilen were as follows:

| | 1978–79 | 1979–80 | 1980–81 | 1981–82 | 1982–83 |
|---|---|---|---|---|---|
| Klapper | $16,000 | $17,120 | $20,308 | $23,729** | $25,390 |
| Zeitler | | $ 8,500* | $22,190 | $23,743 | $25,405 |
| Wilen | | $22,000 | $24,440 | $26,140 | $27,669 |

\* for spring semester only; annualized salary is $17,000.
\*\* salary at end of school year.

---

Klapper's salary was less than Zeitler's in 1980–1981. In 1981–1982, Klapper's salary was $875 less than Zeitler's in the fall semester, and then equalized by her discretionary increase in January. Zeitler's and Klapper's salaries were close enough for the rest of 1982, and in 1982–1983, such that, given the imprecision of the evidence, the Court deems them equal. Klapper's salary was less than Wilen's in each of the relevant years.

### 2. Equal work requirement

In order for Klapper to prove that her work was equal to Zeitler's and Wilen's, she need only show that the work they all performed was substantially equal. *Brock v. Georgia Southwestern College,* 765 F.2d 1026, 1032 (11th Cir.1985); *Mazella,* 642 F.Supp. at 1551. It is irrelevant that they all had the same title of assistant professor in the Economics and Business Department. The jobs, not the job titles, must be equal. *Id.* Finally, the Court is not to compare Klapper's, Zeitler's, and Wilen's qualifications at this stage. Klapper need only show in her prima facie case that the jobs, not the employees, were equal. *Georgia Southwestern,* 765 F.2d at 1032.

The general job responsibilities of assistant professors at New Paltz were the same: teaching three or four courses each semester, meeting with and advising students, and engaging in other departmental service. The evidence indicates that Klapper, Zeitler, and Wilen all served on various committees. In addition, Klapper also devised and coordinated the accounting program. Klapper taught basic, intermediate, and advanced accounting courses. Wilen taught tax accounting and basic accounting courses. Zeitler taught accounting and finance courses.

Based on this evidence, the Court concludes that Klapper's job was equal to Wilen's and Zeitler's. They each were required to do an equal mix of service, advising, and teaching. All taught basic accounting, and each had a different specialty. *See Georgia Southwestern,* 765 F.2d at 1033; *Hein v. Oregon College of Education,* 718 F.2d 910, 918 (9th Cir.1983).

Klapper has thus established a prima facie case with respect to Wilen for the academic years 1979 through 1982, and as to Zeitler in the academic year 1980 and the fall semester of the 1981 academic year.

### C. Defenses to plaintiff's prima facie case

Defendants claim that a merit system and factors other than sex justify the difference in salaries.

#### 1. Merit system

Unequal pay for equal work is justified when the payment is made pursuant to a merit system. 29 U.S.C. § 206(d)(1)(ii). The merit system must be an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria. The New Paltz

---

**26.** Klapper received the following discretionary increases: December of 1980, $1,990 retroactive to the beginning of the year; and $2,000 on December 21, 1981, of which $1,125 would be retroactive to the beginning of the school year, and $875 would begin in January, 1982. Wilen received a $900 discretionary increase in 1980–81.

merit system does not satisfy these criteria. It is not even a "system", as there is no "systematic" evaluation of employees. Rather, faculty members must nominate themselves for merit increases.

Even if New Paltz did have a merit system, it would not explain the salary differences as Zeitler never received a merit increase. Wilen received one merit increase of $900 in 1980, and his salary would have been higher than Klapper's even without the increase.

Rather than a merit salary system, the differences in the salaries resulted from differing starting salaries, and there is no evidence that a merit system was used to set starting salaries. Even if one were, it is an unsettled question as to whether the merit system exception applies to starting salaries. See EEOC v. Aetna Ins. Co., 616 F.2d 719, 725–26 (4th Cir.1980); Chang, 606 F.Supp. at 1229.

### 2. Factors other than sex

 A pay differential resulting from market forces is legitimate under the EPA's exception for pay differentials resulting from factors other than sex. Horner v. Mary Institute, 613 F.2d 706, 714 (8th Cir.1980). The fact that a woman is settling to work for a lower salary than a man because of her inferior bargaining position as a woman is not, however, legitimate. Chang, 606 F.Supp. at 1229.

Peter Vukasin, New Paltz' academic vice president during the relevant years, testified that salaries for business professors rose dramatically the year after Klapper was hired. The Court does not credit this testimony, as it is without support, and it is too convenient and coincidental for New Paltz to assert that salaries rose so dramatically the year after Klapper was hired. Even if the Court did accept Vukasin's testimony, the market rate alone could not explain the wide disparity in the various starting salaries.

 Other factors can be considered as legitimate explanations for pay differentials under the EPA. These include: 1) experience and background, EEOC v. First Citizens Bank, 758 F.2d 397, 401 (9th Cir.),

cert. denied, 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 228 (1985); Mazzella, 642 F.Supp. at 1552; 2) education, Walter v. KFGO Radio, 518 F.Supp. 1309, 1318 (D.N.D. 1981); and 3) inducement to hire the best person for the job, Mazzella, 642 F.Supp. at 1552; Walter, 518 F.Supp. at 1318.

Klapper received her Masters in Business Administration ("MBA"), with a concentration in accounting, in 1974 from Fairleigh Dickinson. She became a Certified Public Accountant ("CPA") in 1976. Prior to coming to New Paltz, she taught part-time at Sullivan and Orange County Community Colleges. She taught one or two beginning and intermediate courses per semester for approximately seven semesters, and held the rank of adjunct instructor and then adjunct associate professor.

Klapper had the following work experience: 1955–1965, part-time bookkeeper for her husband's business; 1965–1967, accounts clerk at Sullivan County Community College; 1967–1970, bursar at Sullivan; 1970–1974, comptroller at Sullivan; 1974–1975, accountant with a private accounting firm; and 1975–1978, comptroller at Sullivan. While at Sullivan, Klapper also served as administrator of the Student Faculty Administration and the Sullivan County Dormitory Corporation.

On the resume Klapper submitted to New Paltz, Klapper described the comptroller's job as including preparation of the annual college budget, management of the accounting and reporting system, budgetary and payroll accounting, and student accounting. She described the bursar's job as including supervision of student accounting, collection and disbursement of funds, maintenance of accounting books and records, and financial reporting. Klapper did not list her jobs as administrator of the Student Faculty Administration and the Dormitory Corporation.

Wilen received his MBA from Baruch College in 1958 and a J.D. degree from Brooklyn Law School in 1978. He became a CPA in 1964. His employment record prior to New Paltz was: 1958–1961, private accounting firm; 1961–1968, special investigative auditor and supervisor with the Port

Authority; and 1978–1980, partner in a private accounting firm. Wilen had six years of full-time college teaching experience at St. John's University in New York. This included three years as a lecturer in accounting in St. John's two-year division, and three years as an assistant professor of accounting and chairperson of a small department of business at St. John's Staten Island campus.

Joel Bloom, the chairperson of New Paltz' Business and Economics Department the year Wilen applied, testified that Wilen had the qualifications the Department needed to help develop its business program. Bloom was especially impressed with Wilen's law degree. Wilen requested a starting salary of $22,500, New Paltz offered $22,000, and Wilen accepted it. His salary the previous year had been $11,-000.

Zeitler obtained his MBA in 1968, concentration in accounting, from SUNY–Albany. He became a CPA in 1971. Zeitler taught basic and intermediate accounting at Siena College for one year. He also taught accounting part-time for a total of three or four semesters at Marist College and Dutchess Community College. Zeitler's other experience included two years as an accountant at the firm of Price, Waterhouse, five years as the chief financial officer at a real estate development company, and five years as the owner of a home building company. New Paltz offered Zeitler a $19,000 starting salary, he negotiated for a higher salary, and received $22,190.

 Wilen's experience, background, and education justify a higher starting salary than Klapper. He had six years of full time college teaching experience, Klapper had none. He had also been the head of a small business department and had a law degree, two credentials which New Paltz felt would be very helpful in building its own business program. Wilen's higher salary reflects both his experience and New Paltz' strong desire to hire him.

 Comparing Klapper to Zeitler is more difficult. As far as prior teaching experience, Zeitler had a small edge—one year full-time and three or four semesters

part-time against seven semesters of part-time. On the other hand, Klapper's accounting experience was more extensive and in positions of greater responsibility than Zeitler's. To the Court, Zeitler and Klapper appear to have equal qualifications.

New Paltz presents two other reasons for the differences in pay. First, after Klapper was hired, New Paltz' business program was approved by the state education office, enabling New Paltz to offer higher salaries. This explanation has no weight, as the relation between higher salaries and approval of the business program was not ever explained. Second, New Paltz claims that Klapper was hired during a year in which New Paltz' fiscal crisis was more serious than the year in which Zeitler was hired. There is no credible evidence, however, that the starting salaries were affected by this.

In conclusion, New Paltz has satisfied its burden to prove a legitimate non-discriminatory reason for paying Wilen more than Klapper. New Paltz has not been able to prove such an explanation for Zeitler. Thus, Klapper has proved that New Paltz violated the EPA in the 1980 academic year, and in the fall semester of the 1981 academic year.

D. *Damages for Equal Pay Act Violation*

The remedies for EPA violations are set forth in 29 U.S.C. § 216(b). Remedies include back pay, liquidated damages equal to the back pay, and attorney's fees and costs.

1. Period of backpay award

 Klapper is entitled to damages for only the period in which she suffered pay discrimination. *See Jehle v. Heckler,* 603 F.Supp. 124, 126–27 (D.D.C.1985). Klapper has proven pay discrimination only as to the 1980 and part of the 1981 school years. By then, Klapper's and Zeitler's salaries had been equalized.

Klapper is thus entitled to the difference between Zeitler's and her salary in 1980, or $1,882, and the difference in the fall se-

mester of 1981, or $889. This is a total of $2,771.00.

### 2. Liquidated damages

■ Liquidated damages are awarded to a successful EPA claimant unless the employer shows that it acted in good faith and had reasonable grounds for believing its acts were in conformity with the EPA. 29 U.S.C. § 260. In order to be excused from liquidated damages, an employer must show *both* good faith and reasonable belief. *Doty v. Elias*, 733 F.2d 720, 725–726 (10th Cir.1984).

■ In this case, defendants did make a good faith effort to remedy Klapper's pay disparity: Vukasin recommended that she receive a $4,000 pay increase for the 1980–1981 school year, which would have made her salary equal to Zeitler's. Klapper only received $1,990 that year because that was the maximum discretionary increase. She received $2,000 in two parts 1981–1982, equalizing her salary in the spring semester. However, New Paltz did not have reasonable grounds for believing it was in compliance with the EPA. In fact, it had no grounds for believing it was in compliance as there is no evidence in the record that it made an inquiry. *See Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 464 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). The record does reflect that both Bloom and Vukasin believed that Klapper's salary was inequitable, and Vukasin feared this would lead to legal trouble.

In light of this, Klapper is awarded liquidated damages in an amount equal to her back pay award, $2,771.

### 3. Prejudgment interest

■ A party cannot recover both liquidated damages and prejudgment interest under the EPA. *Doty*, 733 F.2d at 726. *But see Bonura v. Chase Manhattan Bank*, 629 F.Supp. 353, 363–66 (S.D.N.Y.) (liquidated damages and prejudgment interest available in claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621, because purpose of liquidated damages under that statute is punitive), *aff'd*, 795 F.2d 276 (2d Cir.1986).

### 4. Attorney's fees and costs

■ A successful EPA claimant is entitled to both attorneys fees and costs. Plaintiff's counsel is to file an affidavit in support of a fee request within ten days of the date of this opinion.

### E. *Constructive Discharge*

■ In order to succeed on her claim of constructive discharge, Klapper must prove that New Paltz deliberately attempted to force her resignation by creating intolerable working conditions. *Cruz Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (S.D.N.Y.1987). The working conditions must be so difficult or unpleasant that a reasonable person in the employee's position would feel compelled to resign. *Id.* The only conditions that Klapper showed in favor of her claim was unequal pay. This is not sufficient, by itself, to prove constructive discharge. *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980).

### VIII. JANUARY 17, 1985 DISCOVERY ORDER

Defendants have asked that this Court's discovery order of January 17, 1985 be vacated and that costs be awarded. This request is denied at this time without prejudice to defendants making a motion for this relief and allowing the plaintiffs a chance to respond.

### IX. CONCLUSION

■ The plaintiffs' statistical evidence alone did not prove sex discrimination in salary, rank, and initial placement in rank. The evidence about university practices demonstrated that New Paltz' affirmative action program was suspect, its method for redressing salary inequities was flawed but in good faith, and that New Paltz' decisions about retrenchment, the campus school, and the Women's Studies Program were not discriminatory. The only evidence of discrimination against individuals was salary discrimination against Johanna Sayre and Samantha Joe Mullen. These were only isolated incidents, as in no other case

did the Court find any evidence of discrimination in violation of Title VII. None of the individual Title VII claimants succeeded on these claims, and only Harriet Klapper succeeded on her EPA claim.

The Court thus finds for defendants on all claims except Harriet Klapper's EPA claim. The class action and the claims of Ottaviani, Schneeman, Jessup, and de la Cova are dismissed. Judgment is to be entered for Klapper for $5,542.00. A supplemental order will be issued granting Klapper attorneys' fees after her attorney files her affidavit.

SO ORDERED.